John C. OXLEY, dba Oxley Petroleum Co., Appellant/Counter–Appellee,

v.

GENERAL ATLANTIC RESOURCES, INC., a Delaware Corporation, Appellee/Counter–Appellant.

No. 84880.

Supreme Court of Oklahoma.

April 8, 1997.

Gregory L. Mahaffey, Ted A. Ross, Mahaffey & Gore, P.C., Oklahoma City, for Appellant/Counter–Appellee.

Terry J. Barker, Joseph C. Woltz, Jeffery E. Carlson, Pezold, Richey, Caruso & Barker, Tulsa, for Appellee/Counter–Appellant.

SIMMS, Justice:

Both the plaintiff, John C. Oxley d/b/a Oxley Petroleum Co. (Oxley), and the defendant, General Atlantic Resources Inc. (GARI), claim to be the duly elected successor operator of the Hooks Unit wells, located in Pittsburg County. The trial court granted summary judgment in favor of GARI. Oxley appealed, and the Court of Civil Appeals reversed and remanded, directing the trial court to enter judgment in favor of Oxley. We previously granted certiorari. We vacate the opinion of the Court of Civil Appeals, and reverse the judgment of the trial court, finding that disputed issues of material fact preclude the grant of summary judgment in this case.

We address a question of first impression in Oklahoma.

This case centers on whether paragraph 19 of the Joint Operating Agreement (JOA), which was based on an A.A.P.L. Form 610, Model Operating Agreement—1956, permits an owner to change its vote for successor operator within 60 days after notification of the sale of the current operator's interest. Paragraph 19 states as follows:

'Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.'

BHP Petroleum Inc. (BHP), was the operator of the Hooks Unit under the JOA. On April 30, 1993, BHP sent a notice to the unit working interest owners that it had sold its interest in the Hooks Unit wells to GARI and that the closing date of the sale was April 30. BHP also notified the owners that it was resigning as unit operator, effective May 1, 1993.

Also on April 30, 1993, GARI sent a notice to the unit working interest owners that it had purchased BHP's interest in the Hooks

Unit wells and that pursuant to its agreement with BHP, it was assuming the duties of operator of the Hooks Unit as BHP's "representative" pending notification to all working interest owners. In this April 30 notice, GARI also requested the consent of the working interest owners to its appointment as successor operator and enclosed successor operator ballots for the owners to return.

On May 5, 1993 Oxley, one of the unit working interest owners, sent a letter to all the other working interest owners, requesting that the owners appoint Oxley to be the successor operator of the Hooks Unit. The letter enclosed ballots for the owners to return.

On May 1, 1993, the parties to the JOA, along with their rounded fractional interests were as follows:

| Name | Percentage |
| --- | --- |
| GARI | 37.26 |
| Oxley | 34.35 |
| Eberly and Meade Inc. | 10.48 |
| Victoria Exploration Inc. | 8.40 |
| Devon Energy Corp. | 6.70 |
| Marie Brence | 1.38 |
| Hawkins O & G | 1.23 |
| J.A. LaFortune | 17 |

Hawkins voted for GARI on May 3, Eberly voted for GARI on May 5, Victoria voted for GARI on May 7 and Brence voted for GARI on June 14. LaFortune voted for Oxley on May 12, Devon voted for Oxley on May 26, and Eberly, changing its vote, voted for Oxley on June 11. Thus, before Eberly changed its vote, GARI had 57.37 % of the interests voting for it, sufficient to become successor operator (Brence's vote came after Eberly changed its vote). After Eberly changed its vote, Oxley had 51.70% of the interests voting for it, a sufficient amount to make Oxley operator, *if* Eberly's vote change was valid.

GARI claimed that Eberly could not change its vote and GARI continued to act as operator. Oxley brought the present action, seeking a declaratory judgment that Oxley was the duly elected operator. GARI claimed that Eberly was estopped from changing its vote. GARI also counterclaimed, seeking a declaratory judgment that it was the operator and seeking damages

from Oxley for breach of contract and tortious interference with contractual relations. GARI claimed that Oxley tortiously induced Eberly to change its vote. GARI also sought restitution against Oxley for funds it had expended as operator that had benefitted Oxley.

Oxley filed a motion for summary judgment and GARI filed a motion for partial summary judgment. The trial court granted GARI's motion, finding that GARI automatically became operator as soon as it had sufficient votes. The trial court also awarded GARI damages for operating expenses and generally denied the remainder of the parties' claims.

■ The JOA does not expressly address whether a party can change its vote for a successor operator, which creates an ambiguity and requires construction. Both GARI and Oxley have argued policy in support of their respective positions. GARI claims that to permit a 60 day election period and to permit vote changes to support the candidate which offers the best deal would lead to uncertainty. GARI also argues that when Eberly voted for GARI, it accepted GARI's offer to become successor operator and formed a binding contract which there were no grounds to rescind. On the other hand, Oxley argues that to allow vote changes in a 60 day election period would promote the purpose of a JOA by ensuring the selection of the best qualified operator.

The parties have cited no cases which construe the successor operator paragraph of a JOA like this one and we could find none. However, the JOA is a contract and shall be construed like any other contract. *Amarex Inc. v. El Paso Natural Gas Co.,* 772 P.2d 905, 908 (Okl.1987), 2 Kuntz, *Oil and Gas Law,* § 19A.6.

■ A contract should be construed to carry out the intention of the parties at the time the contract was made. *Amoco Production Co. v. Lindley,* 609 P.2d 733 (Okl. 1980). Absent illegality, the parties are free to bargain as they see fit, and the court may neither make a new contract, or rewrite the existing contract. *Bonner v. Oklahoma Rock Corp.,* 863 P.2d 1176(Okl.1993). A contract

should receive a construction which makes it reasonable, lawful, definite and capable of carrying into effect if it can be done without violating the intent of the parties. 15 O.S. 1991 § 159, *Mortgage Clearing Corp. v. Baughman Lumber Co.*, 435 P.2d 135 (Okl. 1967).

Contrary to GARI's argument, construing paragraph 19 of the JOA to permit a change in vote during the 60 day period would not promote instability or uncertainty. According to paragraph 19, the original operator is to operate the wells for not more than 120 days or until a successor operator is elected and can take over the duties of operator. Thus, the operation of the wells should run smoothly, even though the successor operator is not determined until 60 days after the parties are notified of a sale. The only reason that GARI took over operation of the wells in this case is because its purchase agreement with BHP required it to assume BHP's duty to continue to operate the wells pursuant to paragraphs 19 and 21 of the JOA.[1]

A construction of paragraph 19 of the JOA does not permit a rescission as GARI contends. 15 O.S.1991 § 233 provides that a party to a contract may rescind *the contract,* if the consent was given by mistake or obtained through duress, fraud or undue influence. Eberly's vote change was not a rescission of the JOA. Eberly was merely exercising its rights under the JOA. Additionally, Eberly's original vote did not rise to the level of a new contract. Nothing in paragraph 19 suggests that a vote constituted a new contract.

Due to the important part played by custom and usage in determining the intent of parties to contracts such as this model form JOA, which has been in use since 1956, the judgment of the trial court must be reversed, and this cause must be remanded for further proceedings because there are disputed material facts. In reviewing the grant or denial of summary judgment, this Court will examine the pleadings and evidentiary materials to determine what facts are material and to determine whether there is a substantial controversy as to one material fact. If there is a substantial controversy as to a material fact, the grant of summary judgment is improper. *Ross v. City of Shawnee*, 683 P.2d 535(Okl.1984), *Flanders v. Crane Co.*, 693 P.2d 602 (Okl.1984), *First State Bank v. Diamond Plastics*, 891 P.2d 1262 (Okl.1995).

GARI raised two fact issues at the trial court level which were not resolved by the court, but which were made moot by the trial court's ruling in favor of GARI. These issues now must be resolved due to our determination that paragraph 19 of the JOA is ambiguous and requires construction in order to determine the intent of the parties. First, GARI alleged that paragraph 19 of the JOA must be construed according to custom and usage in the oil and gas industry. GARI submitted the affidavit of R. Dobie Langenkamp, who stated that in the election of a successor operator, once a party has received the majority of the votes, then that party immediately becomes the duly elected operator until resignation or removal under the terms of the JOA.

Custom and usage should be considered when interpreting a contract. 15 O.S.1991 § 162. This would especially be true when construing the JOA in the present case, which is based upon a standard form in use in the oil and gas industry since 1956. In *Heiman v. Atlantic Richfield Co.*, 891 P.2d 1252, 1257(Okl.1995), we noted that a JOA incorporates custom and usage. In *Hull v. Sun Refining and Marketing Co.*, 789 P.2d 1272, 1278 (Okl.1989), we defined "usage" as a "practice or method observed with regularity with respect to the transaction being performed." Thus, if on remand, the evidence shows that it is the custom and usage that vote changes are not permitted, then the JOA should be so interpreted.

Second, GARI also claimed that Eberly was estopped from changing its vote because GARI had relied upon Eberly's vote and was misled to its prejudice. The question of estoppel is a mixed question of fact and law. *Crowell v. Thoreau Center, Partnership*, 631 P.2d 751 (Okl.1981), *Bay Petroleum Corp. v. May*, 264 P.2d 734 (Okl.1953).

---

1. Paragraph 21 states that an operator may resign upon written notice of not less than 90 days.

Equitable estoppel is generally understood to prevent one party from taking a position which is inconsistent with an earlier action that places the other party at a disadvantage. Equitable estoppel holds a person to a representation made, or a position assumed, where otherwise inequitable consequences would result to another, who has in good faith, relies upon the representation or position. *First State Bank v. Diamond Plastics, supra* at 1272,*Apex Siding & Roofing Co. v. First Federal Savings and Loan Ass'n of Shawnee*, 301 P.2d 352, 355 (Okl.1956). GARI is entitled to present evidence, on remand, of facts that might support GARI's argument that Eberly was estopped to change its vote.

Accordingly, because the trial court erred in granting summary judgment when there were disputed material facts, the judgment of the trial court is REVERSED AND REMANDED for further proceedings in accordance with this opinion.

All the Justices concur.