**XTO ENERGY INC., Appellant,**

v.

**SMITH PRODUCTION INC., Appellee.**

No. 14–07–00069–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 24, 2009.

E.R. Norwood, Liberty, for appellant.

Eugene M. Nettles, Nancy Hahn Elliott, Macey Reasoner Stokes, Houston, Allyson Newton Houston, Dallas, Thomas R. Phillips, Austin, for appellee.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## MAJORITY OPINION

KEM THOMPSON FROST, Justice.

In this contract-interpretation case, we determine whether the trial court properly granted summary judgment in favor of the operator of an oil and gas lease based on language in two joint operating agreements pertaining to the parties' notification of intent to participate in proposed drilling operations. A non-operator working-interest owner brought breach-of-contract claims against the operator under these two agreements, seeking specific performance as well as damages. The trial court granted summary judgment in favor of the operator. We must determine whether, under the agreements, a party who has received notice of a proposed

drilling operation may change its election and decide to participate in the operation within thirty days of receiving notice of the proposed operation, after that party first responded by giving notice of its election not to participate. As a matter of apparent national first impression, we conclude that, under the unambiguous language of the agreements, such a party may not change its election after it gives notice of its election to the proposing party. Therefore, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the times relevant to this appeal, appellee Smith Production Inc. ("Smith") was an operator under two joint operating agreements ("JOAs")[1] governing exploration and production on an oil and gas lease known as the Bloomberg Lease (the "Lease"). The following parties to the JOAs were non-operating working-interest owners: Chevron U.S.A. Inc. ("Chevron"), Moran Resources Company, CNR Production, LLC, and Frost National Bank as trustee for Franke Interests, Inc. (collectively "Non–Operating Interest Owners").

In May 2004, Chevron contracted to sell certain oil and gas properties to appellant XTO Energy Inc. ("XTO"), including Chevron's working interest in the Lease. A Chevron vice-president, who was in charge of the assets being sold, directed Chevron employees to operate under "the guidelines of business as usual" with respect to any properties involved in the transfer. As part of her directive, the vice-president advised employees by email as follows:

> The Asset Sale Agreement does not require that we need to obtain XTO's consent for AFE's [authorization for expenditures], purchases[,] or new drills; however, we should consult with XTO as

a courtesy on any significant (over $100,000) matters considering that the effective date of the transaction is January 1, 2004 and all expenses will be deducted from the purchase price. We should not go non-consent on any AFE's without prior consultation with XTO.

Under the JOAs, in May and June of 2004, Smith gave written notices to the Non–Operating Interest Owners of its proposal to drill four more wells on the Lease. Under the JOAs, the Non–Operating Interest Owners had thirty days after receipt of the notices within which to notify Smith whether they would elect to participate in the cost of the proposed operations. After analyzing geological data and other information, Chevron decided that it did not wish to participate in the costs of the four proposed wells. Without consulting with XTO and within the thirty-day period for responding, Chevron notified Smith that it elected not to participate in the cost of the four proposed wells.

When Chevron notified Smith of its elections on June 17, 2004, all the other Non–Operating Interest Owners already had notified Smith of their elections to participate in the cost of the four wells. Shortly after receiving Chevron's notification, Smith advised the other Non–Operating Interest Owners of the total interest of the parties approving the operations. By June 22, 2004, the other Non–Operating Interest Owners all advised Smith that they agreed to carry their proportionate share of Chevron's interests. On June 24, 2004, still within thirty days of Chevron's receipt of Smith's notices proposing the four wells, Chevron sent Smith a letter containing four signed AFEs. In this letter, Chevron stated that it elected to participate in the cost of the four proposed wells and that it

---

1. The joint operating agreements are both based on the American Association of Petro-
leum Landmen Model Form Operating Agreement 610–1982.

was revoking its prior notifications to the contrary, explaining that the June 17, 2004 notices had been sent in error.

In a letter Smith responded by asserting that Chevron could not revoke its prior notifications and that Smith still considered Chevron's June 17, 2004 elections to be effective. Because of this position, Smith treated Chevron as a "Non–Consenting Party" rather than a "Consenting Party" under the JOAs. Treating Chevron as a Non–Consenting Party would mean that, under a provision of the JOAs, upon commencement of operations for the drilling of the four wells in accordance with the JOAs, Chevron would be deemed to have relinquished to the other parties, and the other parties would own and be entitled to receive, in proportion to their respective interests, all of Chevron's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, after various deductions, equals the total of the following: 400 percent of Chevron's share of the costs and expenses of drilling, testing, and completing the new wells after certain deductions, 400 percent of Chevron's share of the cost of newly acquired equipment in the wells, 100 percent of Chevron's share of the costs of any newly acquired surface equipment, and 100 percent of Chevron's share of the well operations costs from the first production until Chevron's relinquished interests revert to it ("Non–Consent Provision").[2] After the other parties recoup these costs, then Chevron would return to sharing in production revenues in proportion to its ownership interest.

In August 2004, Chevron and XTO closed on the asset purchase agreement, and XTO became the successor in interest to Chevron's working interest. The four wells at issue have been producing oil, and Smith has been applying the Non–Consent Provision to XTO's interests. In December 2004, XTO filed suit for breach of contract and specific performance against Smith. XTO claimed that Smith breached the agreement by not accepting Chevron's notifications purporting to change its elections. XTO asserts that Chevron had the ability to change its elections within thirty days of receiving Smith's notices proposing the four wells, provided that the other parties had not materially changed their positions in reliance on the initial elections. Therefore, XTO asserts, its interest should not be subject to the Non–Consent Provision. Smith moved for summary judgment on the basis that the unambiguous language of the JOAs does not allow a party to change its election after it has notified the proposing party of its election. XTO submitted two affidavits from an expert in the oil and gas industry who purported to provide opinions as to the custom and trade usage within that industry. The trial court granted Smith's motion and ordered that XTO take nothing on its claims against Smith. The trial court also struck the expert's affidavits "to the extent such affidavits attempt to use custom and usage in the industry to establish ambiguity."

## II. ISSUES PRESENTED

On appeal, XTO argues that the trial court erred in granting Smith's motion for summary judgment and in striking its expert's affidavits as to custom and trade usage.[3] XTO asserts that the JOAs are

---

2. This provision is often called a "non-consent penalty," although one member of the Supreme Court of Texas has suggested that it would be more appropriate to call this provision a "liquidated bonus clause." *See Valence*

*Operating Co. v. Dorsett*, 164 S.W.3d 656, 659 n. 2, 663–65 (Tex.2005); *id.* at 665–66 (Brister, J., concurring).

3. XTO also asserts that the trial court erred in denying its motion for partial summary judg-

unambiguous and allowed Chevron to change its election within thirty days of receiving Smith's notices proposing the four wells, as long as, prior to Chevron's notification of this change, the other parties had not materially changed their positions in reliance on Chevron's initial election. In the alternative, XTO asserts that the trial court should have considered its expert's testimony regarding custom and trade usage and that the JOAs are ambiguous.

### III. STANDARDS OF REVIEW

■ In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex.2000) (per curiam). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex.2007) (per curiam). When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000).

■ In construing the language of the JOAs, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contracts. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To ascertain the parties' true intentions, we examine the JOAs in their entirety in an effort to harmonize and give effect to all of their provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). Terms in a contract are given their plain, ordinary and generally accepted meanings unless the contract itself shows the terms to be used in a technical or different sense. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Whether a contract is ambiguous is a question of law for the court. *Id.* A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003).

### IV. ISSUES AND ANALYSIS

The language at issue is contained in both JOAs. Article VI.B of the JOAs sets forth procedures the parties must follow when a new well is proposed:

ment; however, we cannot review XTO's motion because, in this motion, XTO did not seek a final judgment. *See CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998) (stating that, before a court of appeals may review an order denying a cross-motion for summary judgment not covered by an interlocutory appeal statute, both parties must have sought final judgment in their cross-motions for summary judgment, unless an exception applies that is not applicable to the instant case).

## B. Subsequent Operations:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area other than the [initial well], ... the party desiring to drill ... such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

. . .

2. *Operations by Less than All Parties:* If any party receiving such notice as provided in Article VI.B.1 .... elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on locations, as the case may be)

actually commence the proposed operation and complete it with due diligence.

If less than all parties approve any proposed operation, the proposing party immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non–Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).

If the Consenting Parties comply with the requirements of Article VI.B.2., then the interest of any Non–Consenting Party is subject to the Non–Consent Provision discussed above.

## A. Is Smith's construction of Article VI of the JOAs reasonable?

■ Under Smith's construction of the JOAs, if, after proper notice of a proposal to drill an additional well under Article VI.B.1.,[4] a party to the JOAs timely and properly gives notice to the proposing party as to whether it elects to participate in the cost of the proposed operation, then that party may not change its election, even if it seeks to do so within thirty days after receipt of the notice of the proposed operation. There is no language in the JOAs expressly allowing an electing party to change its election once it has notified the proposing party of the election. Nor is

---

4. This case involves the drilling of four additional wells. Therefore, we limit our analysis to the provisions of the JOAs dealing with additional operations for drilling additional wells.

there language expressly disallowing such a change in election. However, allowing such a change in election would conflict with the intent of the parties as expressed in the unambiguous language of Article VI.B.

There is no provision in the JOAs stating that the proposing party must wait thirty days before it examines elections of the other parties. Rather, under the JOAs, after receiving notice of a proposed operation, a party has thirty days to notify the proposing party whether the receiving party elects to participate in the cost of the proposed operation ("Notice Period"). Failure of the receiving party to give notice of its election within thirty days constitutes an election by that party not to participate. Once a receiving party timely gives notice of its election regarding the drilling operation by properly replying within the thirty days, the Notice Period has expired as to that party. Under the language of the JOAs, a receiving party does not have thirty days to give notice of an election and to give notice of a change in a prior election. Rather, a receiving party only has thirty days to notify of its election. Once all parties have communi-

cated their elections regarding the proposed operation, the Notice Period has expired.[5] When, as in this case, all receiving parties give notice of their elections in less than thirty days after receiving the notice, the Notice Period expires in less than thirty days.[6] Likewise, if fewer than all the parties approve any proposed operation, then the proposing party "immediately after the expiration of the [Notice Period], shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed." The Consenting Parties then have 48 hours, excluding weekends and holidays, to advise the proposing party whether they desire to carry their proportionate part of Non–Consenting Parties' interests. To be entitled to the benefits of Article VI, the party or parties giving the notice and the parties electing to participate in the operation, within ninety days after the expiration of the Notice Period, actually must begin drilling the proposed well or wells.

Construing Article VI to not allow changes in election by the receiving parties

---

5. Our dissenting colleague asserts that, under the JOAs, the parties expressly provide that the Notice Period expires thirty days after the receiving party receives the notice. *See post* at pp. 685–86, 686, 687–88. This is incorrect. The parties expressly provide that each receiving party *has* thirty days after receipt of the notice within which to notify the proposing party *whether that receiving party elects to participate* in the cost of the proposed operation. This is not an express agreement that the Notice Period always lasts thirty days. It is an express agreement that the receiving parties have thirty days to give the proposing party notice of their respective elections. Under this agreement, the receiving parties may choose to take the entire thirty days, or they may give notice in less than thirty days. In the latter case, the Notice Period does not last thirty days.

6. After stating that the receiving parties have thirty days after receipt of notice to reply to the proposing party, the parties agreed that failure of a receiving party to reply "within the period above fixed" constitutes an election by that party not to participate. Our dissenting colleague focuses on the word "fixed" and concludes that the parties expressly agreed that the Notice Period cannot expire in less than thirty days. *See post* at p. 685–86. However, this language simply refers back to the Notice Period established when the parties agreed that the receiving parties "have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation." Therefore, the words emphasized by our dissenting colleague refer to an earlier sentence and do not aid in this court's construction of that earlier sentence.

is consistent with the provisions of the JOAs requiring the proposing party to notify the Consenting Parties of any Non–Consenting Party "immediately after" the expiration of the Notice Period and to begin drilling within ninety days. Therefore, we conclude that Smith's construction of Article VI of the JOAs is reasonable.

## B. Is there another reasonable construction of Article VI of the JOAs?

XTO asserts that a reasonable construction of Article VI is that, after receiving proper notice of a proposal to drill an additional well under Article VI.B.1., a party is entitled to change its election within thirty days after receipt of the notice, provided that the other parties have not materially changed their positions in reliance on the initial election. However, this construction is not grounded in the language of Article VI. Article VI contains no reference to whether the other parties have changed their positions in reliance on another party's election or whether any such change is material. Likewise, the provision contains no reference to a party's ability to change a prior election. Additionally, if a party could change its election if the other parties had not materially changed their positions in reliance on the initial election, it is not clear why the ability to exercise such a privilege would be limited to thirty days after receipt of the proposing party's notice. If a party inadvertently sent notice of its election to participate 33 days after receiving notice and if no party had materially changed its position in reliance on the initial deemed election of non-participation, it is not clear why the passage of thirty days would stop a party from changing its election to one of participation.

This construction also conflicts with language indicating that, once all of the receiving parties have given notice of their respective elections, the Notice Period is over. For example, if all parties had elected to participate on the seventh day following receipt of notice, then the Notice Period would expire on the seventh day. However, if on the twenty-eighth day, one party decided to change its election to an election not to participate, then the proposing party would have the contractual obligation to notify the Consenting Parties of the Non–Consenting Party's election "immediately after" the expiration of the Notice Period, which was on the seventh day.

In addition, in operations that are often time-sensitive, timely notification to the proposing party is important so that the proposing party can make financial arrangements, begin drilling within ninety days, and complete the well with due diligence. XTO's construction replaces a bright-line contractual rule for promptly and clearly determining who is a Consenting Party and who is a Non–Consenting Party with an uncertain rule that requires a determination of whether the other parties materially changed their positions in reliance on the initial election. This construction would not be faithful to the language the parties chose and would introduce uncertainty as to whether each party is a Consenting Party or a Non–Consenting Party. This construction also creates uncertainty as to the respective share of the drilling costs to be paid by the Consenting Parties. XTO argues that, before allowing a receiving party to change its election, it is important to make sure that the other parties have not changed their positions in some material respect in reliance on the initial election; otherwise, as to quickly drilled wells, a party might change its election to avoid dry-hole costs that the party previously agreed to bear or to share in the rewards of a successful well when the party had not shared in the risks. However, adding this material-reli-

ance requirement has no foundation in the language of the JOAs, and it adds uncertainty and a higher likelihood of litigation to determine which parties are Consenting Parties and which are Non–Consenting Parties.

■■■ XTO asserts that Smith's construction is unreasonable because it provides no means by which a receiving party can correct an erroneous notification of election. However, the parties to the JOAs are free not to allow changes in notifications of elections, perhaps to add clarity and expedition to the process of planning, paying for, and executing additional drilling operations. Likewise, the parties are free to provide for means of changing an erroneous election. This court must enforce the JOAs as written and cannot rewrite the agreements or add to their language under the guise of interpretation. *See Schaefer*, 124 S.W.3d at 161–62. If allowing a receiving party to change its election is not supported by the language of the JOAs, this court cannot add a such a provision to the JOAs. *See id; Nearburg v. Yates Petroleum Corp.*, 123 N.M. 526, 943 P.2d 560, 568–70 (Ct.App. 1997) (refusing to read such a provision into the agreement and reversing trial court's judgment, in which the trial court allowed a receiving party in a joint operat-

ing agreement to change a prior election that was "due to inadvertence" because it did so before the other parties were prejudiced or had detrimentally relied on the first election). Furthermore, other model form operating agreements include a provision expressly allowing a receiving party to change its election if it gives the other parties written notice at any time before actual spudding of the proposed well. *See* Rocky Mountain Oil & Gas Ass'n Form 3, Art. 9, § 9.2 (1959) & Form 2, Art. 8, § 8.6 (1955), reprinted in 7 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law*, §§ 920.4, 920.5. (1995); *see also Nearburg*, 943 P.2d at 570. Although model forms of joint operating agreements are in widespread use, parties to each agreement are free to revise or add provisions to the form they are using to suit their agreement and the particular transaction. The parties to the JOAs in this case changed other provisions of the Model Form they were using, but they did not add a provision allowing a receiving party to change an election. *See Nearburg*, 943 P.2d at 570.

■■■ For these reasons, we conclude that XTO's construction is not reasonable and that Smith's construction is the only reasonable construction of the language at issue.[7] Because this language is worded

---

7. Our dissenting colleague concludes that the JOAs are ambiguous and that this court should reverse and remand so that a jury may determine the parties' mutual intent in agreeing to the language of this Model Form. *See post* at pp. 687–88. In reaching this conclusion, our dissenting colleague relies on *Oxley v. General Atlantic Res., Inc. See* 936 P.2d 943, 944–46 (Okla.1997). The *Oxley* case did not involve Article VI; rather, it involved language regarding the selection of a new operator under an agreement based on the American Association of Petroleum Landmen Model Form Operating Agreement 610–1956. *See id.* The issue in *Oxley* was whether a party to a joint operating agreement could change its vote for successor operator. *See id.* This

issue is somewhat similar to the issue in the instant case; nonetheless, the relevant contract language in *Oxley* was different. *See id.* In addition, the *Oxley* court held that the operating agreement in that case was ambiguous because, under Oklahoma law, if a contract does not expressly address the issue in question, then that contract is ambiguous. *See id.* at 945. The *Oxley* court only addressed evidence regarding custom and usage because it previously had determined that the contract was ambiguous. *See id.* at 946. However, the *Oxley* court's ambiguity analysis is contrary to Texas law, under which the failure of the parties to expressly address an issue in their contract does not make the contract ambiguous. *See Seagull Energy E &*

so that courts can give these parts of the JOAs a certain and definite legal meaning and construction, the contract language is unambiguous, and this court construes it as a matter of law. *Schaefer*, 124 S.W.3d at 157. We have not found any state or federal decision addressing the specific issue in this case, and it appears to be an issue of first impression.

Nonetheless, two cases provide some guidance. In *Valence Operating Co. v. Dorsett*, in addressing issues different than those in the instant case, the Supreme Court of Texas construed Article VI of the 1977 version of the Model Form used to create the JOAs. *See* 164 S.W.3d 656, 661–65 (Tex.2005). Though the *Valence* court answered different questions, it analyzed the same parts of an Article VI provision substantially similar to the language in the JOAs. *See id* at 661–63. The *Valence* court concluded that the language of Article VI is unambiguous and that it describes the receiving party's "right to receive notice of proposed operations and to elect to participate in those operations." *See id.* at 661–65. The *Valence* court did not mention any right to change the election. *See id.* Though that issue was not before the *Valence* court and though its description of Article VI does not dispose of the present issue, Smith's position is consistent with the description of Article VI in *Valence. See id.*

In addition, in concluding that the Non–Consent Provision in *Valence* was not an unenforceable liquidated damages provi-

sion, the *Valence* court cited favorably the *Nearburg* case from New Mexico. *See id.* at 663–65 (citing *Nearburg* with approval); *Nearburg*, 943 P.2d at 566–70. The *Nearburg* court construed Article VI of the 1977 version of the Model Form used to create the JOAs. *See id.* The *Nearburg* court analyzed the same parts of an Article VI provision substantially similar to the language in the JOAs. *See id. Nearburg* involved a party who sought to change its election more than thirty days after receiving notice of a proposal to drill a new well, based on alleged inadvertence in not timely responding; therefore, the issue was not the same as that in the present case. Nonetheless, the *Nearburg* court held that the unambiguous language of Article VI does not allow a party to change its election after the passage of thirty days, even if the failure to respond was inadvertent. *See id.* The analysis of the *Nearburg* court supports Smith's construction of the JOAs.

Under the unambiguous language of the JOAs, if, after proper notice of a proposal to drill an additional well under Article VI.B.1., a party to the JOAs timely and properly gives notice to the proposing party as to whether it elects to participate in the cost of the proposed operation, then that party may not change its election, even if it seeks to do so within thirty days after receipt of the proposing party's notice and regardless of whether the other parties have materially changed their positions in reliance on the initial election.[8]

P, *Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345, 347 (Tex.2006); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex.1996). Under Texas law, even absent an express agreement, the issue remains whether there is only one reasonable interpretation, and there may be only one reasonable interpretation based on a review of the language of the contract. *See Seagull Energy E & P, Inc.*, 207 S.W.3d at 345; *Co-*

*lumbia Gas Transmission Corp.*, 940 S.W.2d at 591. Because of this fundamental difference between Oklahoma law and Texas law, the *Oxley* court's analysis is not on point or persuasive as to the issues before this court today.

8. XTO cites *Lenape Res. Corp. v. Tenn. Gas Pipeline Co. See* 925 S.W.2d 565, 573–74 (Tex. 1996). However, contrary to XTO's asser-

## C. Is XTO's expert testimony relevant to the analysis?

XTO submitted two affidavits from an expert purporting to address the custom and usage of the oil and gas industry. By this evidence, XTO did not purport to provide the meaning of any technical or specialized terms used in the JOAs. XTO tried to use this evidence to show that its interpretation of Article VI is reasonable and to assist in the construction of the JOAs. Presuming, without deciding, that it would be proper to use evidence of custom and usage in the oil and gas industry for these purposes, we conclude that XTO's expert did not show that the alleged custom and usage to which he testified is so general and universal that the parties to the JOAs are charged with knowledge of its existence to such an extent to raise a presumption that they dealt with reference to it. *See State Nat. Bank of Houston v. Woodfin*, 146 S.W.2d 284, 286 (Tex.Civ. App.-Galveston 1940, writ ref'd) (stating that "[i]t has been uniformly held in this State that a custom, in order to constitute an element of contract, must be either shown to have been known personally to the parties to the contract, or to have been so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it"); *Energen Res. MAQ, Inc. v. Dalbosco*, 23 S.W.3d 551, 554–56 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (stating same legal standard as *Woodfin* and concluding that testimony was sufficient to raise a fact issue as to custom and usage in case in which witnesses testified that the alleged custom and usage was typical and "common knowledge in the industry"); *Grube v.*

*Donnell Exploration Co.*, 286 S.W.2d 179, 180–81 (Tex.Civ.App.-El Paso 1955, writ ref'd n.r.e.) (holding that purported evidence of custom regarding drilling of oil and gas wells was insufficient because it did not show that the alleged custom was established for a sufficient length of time to have become generally known, certain, and uniform). Therefore, even if the trial court erred in striking this evidence, it would not be reversible error. Even if this court could consider alleged custom and usage in the oil and gas industry in giving effect to the unambiguous JOAs, XTO did not prove any such custom and usage. Therefore, the testimony of XTO's expert does not change our analysis.

## V. CONCLUSION

Under the unambiguous language of each of the JOAs, if, after proper notice of a proposal to drill an additional well under Article VI.B.1., a party to the JOA timely and properly gives notice to the proposing party as to whether it elects to participate in the cost of the proposed operation, then that party may not change its election, even if it purports to do so within thirty days after receipt of the notice of the proposed operation and regardless of whether the other parties have materially changed their positions in reliance on the initial election. XTO did not prove the alleged custom and usage in the oil and gas industry. Therefore, any alleged custom and usage does not affect the construction of the JOAs. Because the trial court did not err in granting Smith's motion for summary judgment, we overrule XTO's issues and affirm the trial court's judgment.

GUZMAN, J., dissenting.

tions, there are substantial differences between Tennessee Gas Pipeline's contract construction arguments and Smith's arguments in the instant case. *See id.* In addition, the

contract language in *Lenape* is not similar to the language in the JOAs. *See id. Lenape* is not on point.

EVA M. GUZMAN, Justice, dissenting.

The majority concludes that a receiving party cannot change its election within thirty days after receipt of the notice because the Notice Period expires upon the earlier of (a) thirty days after receipt of the Notice, or (b) the date on which the receiving party responds. Because I do not believe this interpretation is consistent with the contracts' language, which is ambiguous at best, I respectfully dissent.

## I. APPLICABLE PRINCIPLES OF CONTRACT CONSTRUCTION

In determining whether the language of a contract is ambiguous, we look to the contract as a whole, in light of the circumstances present when the contract was executed. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981);[1] *see also Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996) (op. on reh'g). ("[A] court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served."). We first examine the words of the contract, and considering the business activity to be served, determine whether both proffered interpretations are reasonable. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 628 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (sub. op.). If both interpretations are reasonable, then the contract is ambiguous and there is a genuine issue of material fact regarding the parties' intent. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). This is so even if it appears that one interpretation is more reasonable than another. *See Heri-*

*tage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996) (stating that a contract is ambiguous if it is "reasonably susceptible to more than one interpretation"); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *cf. In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 782 (Tex.2006) (holding that agreements were "not susceptible to more than one reasonable interpretation and are therefore not ambiguous").

Ambiguity must be evident when the contract is read in context of surrounding circumstances, not after parol evidence of intent is admitted. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex.1995) (per curiam); *Williams v. Williams*, 246 S.W.3d 207, 211 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Stated differently, although parol evidence of the parties' intent is not admissible to create an ambiguity, *see National Union*, 907 S.W.2d at 520, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex.1998) (citing *Columbia Gas*, 940 S.W.2d at 589, and *Nat'l Union*, 907 S.W.2d at 520). Such circumstances include "the commonly understood meaning in the industry of a specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material." *XCO Prod. Co.*, 194 S.W.3d at 627–28; *see also Floboots Corp. v. Teas*, 110 S.W.2d 180, 183 (Tex.Civ.App.-San Antonio 1937, writ dism'd) (holding trial court's finding that slate, indurated shale, and quartzite are "metamorphic formations" was supported by properly-admitted expert testimony concerning the meaning of those terms). However, we may not rewrite the

1. "Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There

are limits. For example, when interpreting an integrated writing, the parol evidence rule circumscribes the use of extrinsic evidence." *Id.*

contract "or add to its language under the guise of interpretation." *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.,* 180 S.W.3d 635, 641 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

## II. LANGUAGE OF THE JOINT OPERATING AGREEMENTS

The contract provisions at the heart of this dispute provide in relevant part as follows:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area other than the [initial well], ... the party desiring to drill ... such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.... Failure of a party receiving such notice to reply *within the period above fixed* shall constitute an election by that party not to participate in the cost of the proposed operation.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title removal or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time period provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2. *Operations by Less than All Parties:* If any party receiving such notice as provided in Article VI.B.1 .... elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days *after the expiration of the notice period of thirty (30) days* ... actually commence the proposed operation and complete it with due diligence.

If less than all parties approve any proposed operation, the proposing party *immediately after the expiration of the applicable notice period,* shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhib-

it "A" or (b) carry its proportionate part of Non–Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).... The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.... *Upon commencement of operations ... of any such well* by Consenting Parties in accordance with the provisions of this Article, *each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties,* and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, *all of such Non–Consenting Party's interest in the well and share of production therefrom* until the proceeds of the sale of such share ... shall equal the total of the following:....

Joint Operating Agreements, Art. VI.B. (emphasis added). From this language, the majority draws dispositive inferences with which I disagree.

### III. CONTRACT DEFINES NOTICE PERIOD'S EXPIRATION DATE

Under the majority's interpretation, the Notice Period is subject to several different expiration dates. First, there is the thirty-day deadline described in the contract; this could be called the "Default Expiration Date." In addition to the thirty-day period described in the contracts, however, the majority has discovered two other expiration dates. First, there is the date that could be considered the "Responder's Expiration Date." According to the majority, "[o]nce a receiving party timely gives notice of its election regarding the drilling operation by properly replying within the thirty days, *the Notice Period has expired as to that party.*"[2] Building on this inference, the majority next asserts that "[o]nce all parties have communicated their election regarding the proposed operation, the Notice Period has expired."[3] This could be considered a "General Expiration Date."

I have discovered no authority for the existence of a General or Responder's Expiration Date in the language of the contracts. Although the Notice Period can expire for the various receiving parties on different days, the parties have unambiguously specified the method by which these dates are calculated. Under the terms of the joint operating agreements, the expiration date of the Notice Period is determined not by the date on which a party replies, but by the date on which the party received the notice of the proposed operations: "The parties receiving such a notice shall have *thirty (30) days after receipt of the notice* within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation." (emphasis added). This court cannot assert its contrary inferences as facts, as the majority has done, without rewriting the contract.

The contractual provisions at issue describe no circumstance under which the thirty-day Notice Period expires in less than thirty days; to the contrary, the parties have agreed that this is the period "fixed" for the receiving party to reply: "Failure of a party receiving such notice to reply *within the period above fixed* shall

---

2. *Ante,* at 677–78.

3. *Ante,* at 677–78.

constitute an election by that party not to participate in the cost of the proposed operation." (emphasis added). To *fix* means to "[a]djust or regulate; determine; settle; make permanent. [The] [t]erm imports finality; stability; certainty; definiteness." BLACK'S LAW DICTIONARY 637 (6th ed.1990).[4] The majority's interpretation, however, eliminates the certainty to which the parties agreed.

The inferences drawn by the majority are inconsistent with other express terms of the parties' agreements as well. Under Article VI.B.2., for example, if any receiving party elects not to participate in the proposed operations, then the parties who have chosen to participate "shall, within ninety (90) days after the expiration of the notice period *of thirty (30) days* ... actually commence the proposed operation ...." (emphasis added). Because the phrase *of thirty (30) days* "can be given a definite or certain legal meaning," it is unambiguous and thus, this court should afford the words their plain meaning. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). Under the majority's interpretation, however, the Notice Period expires in a week if all receiving parties respond within seven days. *See ante*, at 677–79 Thus, application of the majority's interpretation would result in a direct conflict with the unambiguous language of the contract.

The majority's rationale for rejecting XTO's interpretation of the contract is equally flawed. The majority states that XTO's suggested construction "conflicts with language indicating that, once all of the receiving parties have given notice of their respective elections, the Notice Period is over."[5] As previously discussed, however, the language of the contracts expressly provides that the Notice Period expires thirty days after the receiving party receives the notice. In light of these unequivocal terms fixing the end of the Notice Period, the contracts cannot be said to support an inference that the Notice Period expires on the *earlier* of thirty days or the date on which the receiving party makes an election.

The majority also reasons that,

[I]f a party could change its election if the other parties had not materially changed their positions in reliance on the initial election, it is not clear why the ability to exercise such a privilege would be limited to thirty days after receipt of the proposing party's notice. If a party inadvertently sent notice of its election to participate 33 days after receiving notice and if no party had materially changed its position in reliance on the initial deemed election of non-participation, it is not clear why the passage of thirty days would stop a party from changing its election to one of participation.

*Ante*, at 679. This confusion arises only because the majority has disregarded the actual language of the contracts, which expresses the parties' agreement on this point in unambiguous terms: "The parties receiving such a notice *shall have thirty (30) days after receipt of the notice* within which to notify the party wishing to do the work whether they elect to participate in

---

4. Although there are more recent editions of Black's Law Dictionary, the sixth edition was released in 1990, the same year in which XTO's predecessor-in-interest signed the first joint operating agreement. The second joint operating agreement repeated the same language. This edition therefore is more likely to express the common understanding of the ordinary meaning of the words in light of the circumstances present when the contract was executed. *See Sun Oil Co.*, 626 S.W.2d at 731.

5. *Ante*, at 679.

the cost of the proposed operation." The parties' repeated statements that the Notice Period for each receiving party ends thirty days after receipt of the notice—not earlier, not later—could hardly be clearer. The passage of thirty days would stop a party from changing its election because the contract says it does.

## A. Case Law Follows Contractual Expiration Dates

Finally, the authorities on which the majority relies do not support its reasoning.[6] In *Nearburg v. Yates Petroleum Corp.*, Nearburg notified Yates on December 1, 1994 of his proposal to drill a well. 1997-NMCA-069, ¶ 5, 123 N.M. 526, 943 P.2d 560. Yates did not respond within thirty days but instead obtained his own drilling permit. *Id.* On January 11, 1995, Yates wrote to Nearburg, proposing to drill the well himself. *Id.* Nearburg sued for, *inter alia*, "an order for specific performance requiring Yates to act as a non-consenting party and to refrain from interfering with Nearburg's proposed drilling. . . ." *Id.* at ¶ 6. Yates counterclaimed, seeking a declaratory judgment that Yates was the operator of the proposed well and a consenting party under the operating agreement. *Id.* According to Yates, he could change his election *any* time before Nearburg began operations. *Id.* at ¶ 11. The New Mexico Court of Appeals found in favor of Nearburg, stating, "We see no indication that the parties to the operating agreement intended to allow a change in election *after the thirty day notice period.*" *Id.* at ¶ 24 (emphasis added). The court further explained that Yates's "analysis is inconsistent with express contract language, because it virtually ignores the provision in Article VI(B)(1) requiring an election to be made *within thirty days.*" *Id.* at ¶ 12 (emphasis added) (citing *Kirkpatrick v. In-*

*trospect Healthcare Corp.*, 114 N.M. 706, 845 P.2d 800, 805 (1992) (holding that the interpretation of a contract cannot ignore the contract's express provisions)). Thus, *Nearburg* undermines rather than supports the majority's analysis.

The same is true of *Valence Operating Co. v. Dorsett.* 164 S.W.3d 656 (Tex.2005). In *Valence,* the issue was whether the parties' joint operating agreement "require[d] a *thirty-day notice period* to expire before the operator [could] commence work on the proposed operations." *Id.* at 658. (emphasis added). The court concluded that Valence could begin operations less than thirty days after notifying the parties of its proposed operations, but stated, "the risk of early commencement of such operations falls entirely on the operator because if none of the working interest owners consent to participation within thirty days, the operator bears the full cost of operations." *Id.* at 663. The court provided no exception for circumstances in which the receiving parties' time for electing to consent to participation in the operation is less than thirty days.

Although the dispute addressed in *Oxley v. General Atlantic Resources., Inc.* is much closer to the issue presented in this case and requires much the same analysis, the majority dismisses it. 936 P.2d 943, 944–46 (Okla.1997). In *Oxley,* a provision in the parties' joint operating agreement provided that "[s]hould a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator." *Id.* at 944. The issue presented was whether a party could change its vote for a successor operator within that sixty-day period. *Id.* at 944–

---

6.  In light of the parol evidence rule, I also am not persuaded that it is appropriate to take

notice of the existence or contents of other model form operating agreements.

45. The court concluded, "The JOA does not expressly address whether a party can change its vote for a successor operator, which creates an ambiguity and requires construction." *Id.* at 945. Due primarily to contested facts regarding the custom and usage in the industry,[7] the Oklahoma Supreme Court could not resolve the ambiguity, and it remanded the case. *Id.* at 946. Although *Oxley* is not binding on this court, its reasoning is sound, and I similarly would conclude that, at a minimum, a fact issue is present in this case.

In sum, the majority has chosen to add some words to the contract rather than others. Although it is true that the contract provisions do not state that a receiving party has "thirty days to give notice of an election and to give notice of a change in a prior election,"[8] it is equally true that the contract states no circumstances under which the thirty-day Notice Period expires in less than thirty days.

## B. Contract is Ambiguous

As in *Oxley*, the issue here is whether a party can change its decision within the time limit fixed by the contracts for making the decision. The contracts here, like the contract in *Oxley*, do not expressly state the answer. Nevertheless, courts must interpret a contract by "ascertaining the true objective intentions of the parties, based on the contract language." *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex.2005) (per curiam) (citing *Coker*, 650 S.W.2d at 393). The intent of a contract is not changed simply because the circumstances do not precisely match the anticipated scenarios. *Id.* Because the interpretation urged by XTO is reasonable, the contracts are, at best, ambiguous. Thus, I would reverse and remand the case for further proceedings, and in light of that decision, I would not reach the question of whether the trial court properly excluded or limited the purpose for which the Barnhill affidavits were admitted.[9]

---

7. In addition, factual determinations were necessary to address the argument that a candidate operator relied to its detriment on the receiving party's original vote. This argument was of secondary importance, because if the terms of the contract did not permit a party to change its vote, then the court would not reach the question of whether equitable grounds prevented a party from changing its vote in a particular case. *See id.* at 946–47.

8. *Ante,* at 677.

9. Like the majority, I would not reach the question of whether XTO's interpretation is the only reasonable construction of the contractual language because, as the majority has explained, the ruling on XTO's motion for partial summary judgment is not properly before this court for review. *See ante,* at 675–76, n. 3.