OAK TREE PARTNERS, LLC v. WILLIAMS



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:OAK TREE PARTNERS, LLC v. WILLIAMS

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 OAK TREE PARTNERS, LLC v. WILLIAMS
2020 OK CIV APP 5
Case Number: 115853
Decided: 11/26/2018
Mandate Issued: 02/13/2020
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2020 OK CIV APP 5, __ P.3d __

 

OAK TREE PARTNERS, LLC, an Oklahoma Limited Liability Company, Plaintiff/Counterclaim Defendant/Appellee/Counter Appellant,
v.
TRACY WILLIAMS, Defendant/Counterclaim Plaintiff/Appellant/Counter Appellee,
and
JEFFREY O. BOLDING, Third-Party Defendant/Appellee.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE ALETIA HAYNES TIMMONS, TRIAL JUDGE

AFFIRMED IN PART AND REVERSED IN PART

William A. Johnson, Matthew W. Brockman, Michael A. Furlong, HARTZOG CONGER CASON & NEVILLE, Oklahoma City, Oklahoma, for Plaintiff/Counterclaim Defendant/Appellee/Counter Appellant and Third-Party Defendant/Appellee

Kiran A. Phansalkar, CONNER & WINTERS, LLP, Oklahoma City, Oklahoma, and
Matthew L. Warren, WARREN LAW OFFICE PLLC, Tulsa, Oklahoma, for Defendant/Counterclaim Plaintiff/Appellant/Counter Appellee

P. THOMAS THORNBRUGH, CHIEF JUDGE:

¶1 Tracy Williams appeals a combination of summary judgments, directed verdicts, and a jury verdict in this case that arose from a failed land deal. Oak Tree Partners, LLC (OTP), also appeals two judgments of the district court. On review, we reach the following conclusions:

1. Williams was not entitled to the remedy of "specific performance with abatement" in this case, and the district court did not err in granting summary judgment against him.

2. The status of the contractual disclaimer of warranty in this case is not determined by the question of whether this was a "per acre" sale, nor is it determined by case law involving residential real estate sales. The district court did not err in granting summary judgment against Williams' contract claims.

3. Williams' fraud claims failed to demonstrate the element of detrimental reliance, and the district court did not err in granting summary judgment against Williams' fraud claims.

4. In this case, the relevant section of the Oklahoma Real Estate License Code (ORELC), 59 O.S.2011 §§ 858-101 through 858-515.2, creates no heightened duty or independent cause of action separate from common law fraud, and the district court did not err in granting summary judgment against Williams' ORELC claims.

5. OTP's slander of title cause of action failed as a matter of law because the filing of a petition and lis pendens in these circumstances is privileged, and the district court erred in submitting this claim to the jury.

6. As a result, OTP was not entitled to damages for slander of title.

7. OTP was, therefore, not entitled to fees as prevailing party in a slander of title action; in addition, the quiet title judgment was not fee-bearing because the provisions of the Nonjudicial Marketable Title Procedures Act were not followed.

8. The district court did not err in granting judgment against OTP's claim of fraudulent inducement by Williams.

9. The district court did not err in granting judgment against OTP's claim of "breach of warranty" by Williams.

BACKGROUND

¶2 An abbreviated history of this case is as follows: On April 1, 2014, Williams and OTP entered into a "uniform purchase contract," which Williams drafted with the following terms:

Uniform Purchase Contract

I, or we, the undersigned hereby agree to purchase hereinafter described, to-wit:

All Property owned by Oak Tree Partners LLC located on the west side of Kelly within Oak Tree as described by the Oklahoma County Assessor R168590155, R168590150,additional acreage "A" in the NW corner of the Paddocks. See legal and map attached on Oklahoma County Assessor Real Property Detail Sheet.

Subject, however, and on condition that seller thereof has good and valid title, in fee simple, and agrees to furnish abstract to date of payoff and convey said premises by special warranty deed. On the following terms:

The total price to be Five Million One Hundred Fifty Thousand and NO/100 Dollars ($5,150,000.00), of Which Fifty Thousand and NO/100 Dollars ($50,000.00) is to be paid in cash in accordance with the terms of this agreement, the balance to be on the following terms, to-wit:

$50,000.00 hereby acknowledged. The remaining principal balance of $5,100,000.00 to be paid in cash by Friday August 1, 2014.

"All Property" includes ALL Land known as Tract G 44.l2ac, Paddocks NW/C 16.8 acres, Paddocks Lots (2) 4.82 acres, FF 16.23 acres, FN 17.74 acres. -- Refer to attached 2 page email from Jeff Bolding on 3/21/14.

Seller to pay for a boundary and alta survey for the above parcels.

Seller to pay Doc Stamps and abstracting. Buyer to pay for title insurance. All other closing costs to be split equally by buyer and seller.

Buyer has been granted a due diligence period until May 30, 2014. The $50,000 earnest money is to go "hard" and non-refundable after May 30, 2014.

Buyer is a licensed realtor. No commission will be paid.

¶3 Among the documents Williams attached to the purchase contract were two printouts from the county assessor's website,[1] two rough hand-drawn diagrams, and an extract from an email to Williams from Third-party Defendant Jeffrey Bolding, as follows:

On Mar 21, 2014, at 9:43 AM, Jeff Bolding

" <jbolding@blantonproperty.com wrote:

 
 
 
 G (Kelly)
 
 
 44.12
 
 
 $70,000.00
 
 
 $3,088,400.00
 
 
 
 
 Paddocks NW/C
 
 
 16.8
 
 
 $70,000.00
 
 
 $1,175,000.00
 
 
 
 
 Paddocks Lots (2)
 
 
 4.82
 
 
 $250,000. ea
 
 
 $500,000.00
 
 
 
 
 FF
 
 
 16.23
 
 
 $70,000.00
 
 
 $1,085,700.00
 
 
 
 
 FN
 
 
 17.74
 
 
 $70,000.00
 
 
 $1,241,800.00
 
 
 

 

Adding the totals, this attachment appeared to identify 99.71 acres of property. However, a part of the tracts identified in the contract had, in fact, already been sold by OTP to a third party. The stated purchase prices add up to $7,090,900, not the $5,150,000 + $50,000 earnest money stated in the purchase contract.

¶4 OTP also drafted an addendum that was made a part of the contract and included the following language:

PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, AND SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS OF ANY KIND OR CHARACTER, ORAL OR WRITTEN PAST, PRESENT OR IN THE FUTURE, REGARDING ANY ASPECT OF ANY OF THE PARCELS BEING SOLD (THE "PROPERTY").

ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, WARRANTY. COVENANT OR AGREEMENT REGARDING THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED IN THE AGREEMENT. PURCHASER ACKNOWLEDGES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATIONS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER.

¶5 The contract provided for a 60-day due diligence period.

¶6 On July 21, 2014, after the due diligence period had expired, but before the August 1, 2014 payment date, Williams, through counsel, sent a letter to OTP alleging the following:

1. The 44.12 acre tract contained only 39.69 acres;

2. The 17.74 acre tract contained only 15.79 acres;

3. The 16.8 acre tract actually contained 17.43 acres.

Williams alleged a shortfall of 6.47 acres, and requested a reduction of $335,205 (i.e., $51,500 per acre) in the purchase price. OTP responded that the shortfall was only 4.28 acres,[2] and invoked the warranty disclaimer and the end of the due diligence period. On that basis, OTP stated that Williams was not entitled to a price reduction or to rescind the contract.

¶7 On July 28, Williams responded with a settlement offer that claimed fraud by OTP and Bolding, and offered to settle for performance of the contract and a credit of $483,000. The latter amount apparently consisted of $380,000 for a lot known as Paddock 16 that was included in the original contract but not owned by OTP, and damages to compensate Williams for the "benefit of the bargain." OTP rejected this offer. On August 11, 2014, OTP filed a petition for declaratory judgment, quiet title, and money damages. On August 12, Williams filed a petition against OTP and Bolding seeking "specific performance with abatement," lost profit damages for breach of contract and/or for fraud, and damages for "breach of real estate license obligations" by Bolding. Williams also filed a lis pendens against the property. OTP moved to dismiss Williams' petition, or in the alternative, to consolidate the cases filed by OTP and Williams. The court denied the motion to dismiss and consolidated the two cases.

¶8 On November 14, 2014, OTP moved for summary judgment on Williams' claims against OTP. On January 6, 2015, the district court granted this motion. A prolonged and contentious exchange among counsel followed regarding the details of a journal entry.[3] A journal entry was eventually filed on March 6. Meanwhile, OTP filed a motion to amend its petition to add new claims against Williams, including fraudulent inducement, tortious interference, and slander of title. These claims were based on the argument that Williams had intentionally signed, then reneged, on the warranty disclaimer, and had deliberately brought meritless claims and filed a lis pendens to block the sale of the property to a willing third-party buyer. The court allowed the amendment. On March 16, 2015, OTP filed a motion for partial summary judgment on several issues, including whether Williams was entitled to "specific performance with abatement." The court denied this motion on March 30.

¶9 On May 26, 2015, Bolding filed a motion for summary judgment on Williams' claims against him. This motion was eventually granted in August 2016.[4] In January 2016, OTP filed a motion for partial summary judgment on Williams' affirmative defense of fraud, which the court granted. In January 2016, Williams filed a motion to reconsider the January 2015 summary judgment disposing of his claims against OTP. He also filed a motion seeking summary judgment against OTP's claims for breach of warranty, fraudulent inducement, and slander of title. The court granted summary judgment against OTP's claims for fraudulent inducement. It denied the motion to reconsider.

¶10 In August 2016, OTP dismissed (over Williams' objection) the remainder of its declaratory judgment claims, leaving its claims for quiet title, tortious interference, and slander of title. These matters were set for trial in February 2017. At trial, the jury found for Williams on OTP's tortious interference claim and for OTP on its slander of title claim in the amount of $250,000. The jury also made a first stage finding of intentional and malicious conduct by Williams, and considered second stage punitive damages, but awarded $0. OTP then moved for triple damages pursuant to 16 O.S.2011 § 79, and the court sustained the motion. The court later awarded attorney fees to OTP pursuant to the same statuary section. Both parties now appeal various aspects of the proceedings.

STANDARD OF REVIEW

¶11 This case includes claims determined by a jury trial, claims determined by summary judgment, and claims sounding in equitable theories of recovery. The appellate standard of review of summary judgment is de novo. Boyle v. ASAP Energy, Inc., 2017 OK 82, ¶ 7, 408 P.3d 18. Matters of equitable cognizance require the application of two standards of review. Hall v. Galmor, 2018 OK 59, ¶¶ 11-13, 427 P.3d 1052. "We will not reverse the trial court's factual findings or ultimate decision unless they are clearly against the weight of the evidence." Id. ¶ 12. "Issues of law, however, are reviewable by a de novo standard." Id. ¶ 13. Williams' argument regarding the jury verdict is that it is tainted by fundamental error because, as a matter of law, a slander of title cannot be based on the filing of an accurate lis pendens. The trial court's duty is to state the law correctly, and as noted, questions of law are reviewed de novo. De novo review is plenary, independent, and non-deferential. Pina v. Am. Piping Inspection, Inc., 2018 OK 40, ¶ 14, 419 P.3d 231.

ANALYSIS -- WILLIAMS' ALLEGATIONS OF ERROR

¶12 Williams briefs seven propositions of error, as follows:

I. The district court erred by granting OTP summary judgment on Williams' counterclaim for specific performance and/or breach of contract.

II. The district court erred by granting OTP summary judgment on Williams' counterclaim for fraudulent misrepresentation.

III. The district court erred by granting Bolding summary judgment on Williams' third-party claim for fraudulent misrepresentation.

IV. The district court erred by granting Bolding summary judgment on Williams' third-party claim for breach of obligations under the ORELC.

V. The district court erred by denying Williams' motions for directed verdict and judgment notwithstanding verdict on OTP's slander of title cause of action.

VI. The district court erred by granting OTP's motion for entry of judgment on quiet title claim and for treble damages pursuant to 16 O.S. § 79.

VII. The district court erred by granting OTP's amended and corrected motion for award of attorney fees and costs pursuant to 16 O.S. § 79.

I. SUMMARY JUDGMENT ON WILLIAMS' CLAIMS FOR SPECIFIC
PERFORMANCE AND/OR BREACH OF CONTRACT

A. Specific Performance

¶13 Williams argues that the court erred in granting summary judgment against his claim for specific performance of the contract. As we noted in our prior opinion in Appeal No. 115,427, Williams did not seek "specific performance" as it is generally understood in Oklahoma jurisprudence, but sought "specific performance with an abatement of purchase price," i.e., a court-ordered performance involving less property at a court-imposed lower price. A canvass of the published Oklahoma decisions reveals only three cases mentioning this remedy in the last 85 years.[5] Hales v. Rasmussen, 1932 OK 255, ¶ 9, 9 P.2d 944, states, "We have such a thing as a decree in specific performance with abatement of price," but the Rasmussen Court did not apply the remedy, or state any standards by which it must be judged.

¶14 In Tickel v. Felton, 1959 OK 206, 345 P.2d 901, the plaintiff signed a contract to buy land from two brothers who were tenants-in-common, but one brother didn't sign the contract. Plaintiff sought to enforce the contract for half the property, at half the price. The trial court found in favor of plaintiff but then granted a new trial. Plaintiff appealed the grant of new trial. The Tickel Court appeared to contradict Hales, noting that "the question of whether partial specific performance may be had, with abatement of consideration . . . , has never been decided in this jurisdiction," and upheld the grant of a new trial without further comment on this claimed remedy. Id. ¶ 9.

¶15 Finally, in In re Hayhurst's Estate, 1970 OK 224, 478 P.2d 343, the Supreme Court apparently recognized the remedy using two legal encyclopedias as a basis. This decision is difficult to interpret, however, because the Hayhurst's Estate Court did not actually apply the remedy it recognized.

¶16 The Court first stated, at 1970 OK 224, ¶ 20:

It is a general rule that where the vendor is unable to convey the property which he has agreed to convey because of a defect in the quality or quantity of the estate which he possesses and the vendee has entered into the contract without knowledge or notice of the deficiency or defect in the vendor's title, the vendee may have specific performance of the contract as to whatever interest the vendor has with such restitution or abatement as to the purchase price as may be determined by the court. 81 C.J.S. Specific Performance s 21b(2)(a), p. 448. See also 49 Am.Jur. Specific Performance, s 105, p. 123; Bellamah v. Schmider, 68 N.M. 247, 360 P.2d 656; Annotation 154 A.L.R. 767, 768; Hart v. Honrud, 131 Mont. 284, 309 P.2d 329, 333.

It then heavily qualified the remedy, at ¶¶ 21-22, as follows:

There are limitations and qualifications to this general rule granting specific performance with abatement of a portion of the purchase price. Specific performance cannot be invoked by the purchaser who, at the time of making the contract, had notice of the fact that the vendor had a limited interest in the land, or that his title was defective. 49 Am.Jur. Specific Performance, s 106, pp. 125, 126; 81 C.J.S. Specific Performance s 21b(2)(a), p. 450; Bellamah v. Schmider, supra; Caveny v. Asheim, 202 Or. 195, 274 P.2d 281, 293.

Another qualification to such general rule is that specific performance should not be granted where to do so would in effect make a new contract between the parties. 81 C.J.S. Specific Performance s 21b(2)(a) p. 449; Bellamah v. Schmider, supra; Waldeck v. Hedden, 89 Cal.App. 485, 265 P. 340, 342; Merritz v. Circelli, 361 Pa. 239, 64 A.2d 796, 7 A.L.R.2d 1325, 1329. (Emphasis added).

The Court then went on to find that the remedy was not applicable in that case because, "It is our conclusion that [Plaintiff] knew of the defect in the title, and of the hazards of establishing a marketable title." 1970 OK 224 at ¶ 24.

¶17 Consequentially, the Court did not explain how to resolve the potential conflict between ¶ 20, allowing a court to equitably change fundamental contract terms such as quantity and price, and ¶ 22, forbidding a court from making a "new contract between the parties." Aequitas sequitur legem (equity follows law), and the principle that a court may not re-write a contract is well-established. See Oxley v. General Atlantic Resources, Inc., 1997 OK 46, ¶ 14, 936 P.2d 943; Mercury Inv. Co. v. F.W. Woolworth Co., 1985 OK 38, 706 P.2d 523. The Supreme Court noted in Atkinson v. Barr, 1967 OK 103, ¶ 35, 428 P.2d 316, that proof that a contract was established is a pre-requisite to a right to specific performance and the general rule that there must be a "meeting of the minds of the contracting parties upon all the material terms and provisions" before a contract is formed. See Roads W., Inc. v. Austin, 2004 OK CIV APP 49, ¶ 15, 91 P.3d 81, citing Niagara Fire Ins. Co. v. Aebischer, 1934 OK 684, 44 P.2d 5.

¶18 The answer to this dilemma may lie in the very unusual facts of Hayhurst's Estate, in which a probate was filed in 1932 and remained open for 33 years. During this period, Fannie Hayhurst agreed to sell Doyle Westfall 240 acres in Lincoln County for $15,000, plus the expense of a "title suit." Id. ¶ 5. The title suit was necessary because of the open probate question as to whether Fannie had actually inherited the 240 acres. Before this claim was resolved, Fannie filed a probate election to take a statutory one-third share of the property. Id. ¶ 7. This left Westfall with a contract to buy 240 acres from Fannie, who had renounced her right to 160 of those acres.

¶19 It was at this point that the Hayhurst's Estate Court raised the question of "performance with abatement," i.e., whether Westfall was entitled to enforce a contract for one-third of the property at one-third of the price. The court held that he was not, because Westfall knew of the "hazards of establishing a marketable title, and that to grant specific performance as to the one-third interest would in effect make a new contract between the parties."[6] Id. ¶ 24.

¶20 Even assuming (without holding) that such a remedy may be considered in this case, the question is whether the holding of Hayhurst's Estate acts as Williams argues -- to invalidate a disclaimer of warranty with an accompanying due diligence period -- in a modern commercial real estate transaction. Applying "specific performance with abatement" in such a case could fundamentally alter the nature of commercial contracts. Absent fraud, a commercial buyer who discovers a deficit in the stated acreage or other representation during the due diligence period has three options: to continue the transaction without complaint; to withdraw from the transaction within the due diligence period; or to negotiate a new price with the seller. If the buyer does not take advantage of this due diligence period, the defect is generally waived.

¶21 This system would be fundamentally altered if a buyer were permitted to ignore these contractual paths and options and courts were to routinely impose new purchase prices for property whenever an inaccuracy or defect is discovered. Indeed, there would be little purpose in a contractual due diligence period if the courts will later correct any failure of a buyer to inspect or verify representations and conditions.[7]

 

¶22 Key to the Hayhurst's Estate decision was the finding that Westfall knew of the "hazards of establishing a marketable title, and that to grant specific performance as to the one-third interest would in effect make a new contract between the parties." Id. We are not inclined to read this statement as holding that a disclaimer of warranty in a commercial real estate contract is invalidated by the doctrine of specific performance with abatement, or that courts may fundamentally re-write contracts. The opposite conclusion appears more likely true, i.e., that a disclaimer puts a buyer on notice of the "hazard" of inaccurate size and that abatement is not available. In the context of this case, we find no error in the district court's decision regarding "specific performance with abatement of price."

 

B. Breach of Contract

¶23 Williams next argues that the district court erred in granting summary judgment against his breach of contract claim. The fundamental question presented here is whether the disclaimer of warranty contained in the purchase contract is effective in this case. First, however, Williams argues that the district court made irreconcilable decisions which, in turn, demonstrate the existence of a question of fact as to his breach of contract claim.

1. "Irreconcilable Decisions"

¶24 The court granted summary judgment against Williams' claims for specific performance with abatement and breach of contract. It also denied OTP's motion seeking judgment that Williams was not entitled to an abatement of the purchase price. Williams argues that the court thereby found that there was a question of fact as to whether Williams was entitled to abatement, and also found that there was not a question of fact whether Williams was entitled to abatement. Therefore, he argues, the court's own decisions show a dispute of fact.

¶25 This argument, however, ignores another possibility -- that one decision was wrong. It further does not take into account the appellate standard of review of a summary judgment as part of a final order. We review these decisions as merged into the final judgment de novo based on the record, and give no deference to the district court's conclusions of law. If the decisions were truly inconsistent, our task is to determine which was correct, not to simply return the matter to the district court. As discussed above, we find no error in the district court's summary judgment against Williams' claim for "specific performance with abatement." Thus, any contrary finding by the district court is a nullity.

2. The Disclaimer of Warranty

¶26 The parties executed an addendum to the Uniform Purchase Contract that stated as follows:

PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, AND SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS OF ANY KIND OR CHARACTER, ORAL OR WRITTEN PAST, PRESENT OR IN THE FUTURE, REGARDING ANY ASPECT OF ANY OF THE PARCELS BEING SOLD (THE "PROPERTY").

ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, WARRANTY. COVENANT OR AGREEMENT REGARDING THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED IN THE AGREEMENT. PURCHASER ACKNOWLEDGES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATIONS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER.

¶27 Williams argues that the disclaimer applies only to "extra contractual" representations. This interpretation is at odds with the contractual language that Williams "acknowledges that, having been given the opportunity to inspect the property, purchaser is relying solely on its own investigations and not on any information provided or to be provided by seller." (Emphasis added). The plain language of the addendum is not limited to extra-contractual representations (which, regardless, would not be a part of the contract at common law).

¶28 Williams further argues that the disclaimer of warranty is ineffective because the sale was made on "per acre" basis instead of a "tract" basis, relying on a line of cases typified by Hickman v. Hight, 1923 OK 537, 217 P. 878. Williams argues that, because the total acreage could be calculated from the attachments to the purchase agreement, and a total purchase price was stated, a "per acre" price can be calculated. He contends that if a per acre price can be calculated, the contract becomes a "per acre" contract and its legal status changes. Williams essentially argues that Hickman invalidates disclaimers of warranty as to size in a "per acre" contract, and that delivery of the exact stated acreage (or damages) is required.

¶29 In a state that uses a grid survey system to make legal descriptions, however, many "tract" descriptions clearly convey certain acreages that can be used to calculate a per acre price. A quarter-section is known by any competent purchaser to contain 160 acres, a quarter/quarter to contain 40 acres, etc. Further, any commonly shaped tract with dimensions stated in feet can quickly be calculated as acreage. Therefore, by Williams' interpretation, all land sales are "per acre" unless the contract mentions neither acreage nor dimensions nor a portion of a section. The ability to calculate acreage by a simple mathematical process affords an unlikely ground on which to substantially change the effect of a contractual disclaimer.

¶30 We also note that, in his interlocutory appeal in Appeal No. 115,427, concerning the lis pendens issue, Williams argued that the shortage of acreage came from "the three most valuable parcels of land,"[8] thus suggesting that each acre was not of equal value, which is a salient feature of a "per acre" contract. Fundamentally, however, we do not agree that the result of Hickman, or the status of a contractual disclaimer of warranty, turns on this per acre vs. tract distinction.

¶31 In Hickman, the plaintiff contracted to purchase land for $5,850, and was given a deed for:

All that part of the southeast quarter of the southeast quarter of the southwest quarter, lying east and south of the Poteau river, * * * and all that part of the northwest quarter of the northwest quarter of section twenty-three (23) lying west of James Fork creek, all in township eight (8) north and range twenty-five (25) east, of the Indian base and meridian, containing 117 acres more or less . . . .

Id. ¶ 2

¶32 The plaintiff later sued, alleging a shortage in the amount of land actually conveyed, and the jury agreed, finding a shortage of 15.4 acres and ordering damages of $50 per acre for breach of the warranty deed. The defendant seller appealed. The Supreme Court concentrated not on an acreage versus tract analysis but on whether the phrase "117 acres more or less" in the deed was merely an approximate description of the property or a warrantied transfer of 117 acres. The Court held that "the words 'more or less' apply only to small excesses or deficiencies" and "imply that there is no considerable difference in quantity[.]" Id. ¶ 10.

¶33 The rule of Hickman appears to be two-fold: 1) the purchaser of land described without measurement should expect a greater variation in estimated-versus-actual size than should the purchaser of a specifically defined acreage; and 2) a description of an acreage as "more or less" waives only "unimportant inaccuracies" in size.

¶34 Applying the foregoing to the instant case, even if the approximately 16 percent shortage in Hickman can be equated to the 7.1 (or 6.6, or 4) percent shortage here, Hickman and similar cases involve only the mildest type of disclaimer -- i.e., that a tract is of a certain size "more or less," meaning that these words are "intended to cover some unimportant inaccuracy." We find no indication that Hickman, or any similar case, invalidates a much more explicit disclaimer of warranty in a commercial real estate contract that contains a due diligence period and a purchaser's agreement that it "is relying solely on its own investigations."

¶35 We further note that, in Hickman and similar cases, the plaintiff actually purchased the undersized tract at full price, and equity therefore demanded the court's intervention. Here, Williams did not purchase the purported 99.71 acres and then discover a shortage. He did not purchase it at all and then attempted to apply Hickman to a form of "anticipatory breach." We find no error in the district court's grant of summary judgment against Williams' breach of contract claims.

II. FRAUDULENT MISREPRESENTATION BY OTP

A. Residential cases such as Bowman and Lopez do not control in this case

¶36 Aside from the question of breach of contract, Williams argues that OTP committed independently actionable fraud by representing that the property consisted of 99.71 acres when, in fact, it was some four acres less. Williams' claim is one of fraud in the inducement, which is defined as "a misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risk, duties or obligation she has undertaken." Harkrider v. Posey, 2000 OK 94, ¶ 11, 24 P.3d 821.[9] Case law recognizes the general principle that a party may not contractually disclaim his or her own representation if the representation is fraudulent.

¶37 Williams cites Bowman v. Presley, 2009 OK 48, 212 P.3d 1210, and Lopez v. Rollins, 2013 OK CIV APP 43, 303 P.3d 911, as holding that the disclaimers of warranty and reliance here are invalidated by case law, and that for purposes of his fraud claim, he reasonably relied on the inaccurate statement of acreage as a matter of law despite the disclaimer.

¶38 Bowman dealt with a residential property that was discovered, after purchase, to be 700 square feet (25 percent) smaller than was presented in the realtor's materials. The sales contract contained the following disclaimer:

15. DISCLAIMER AND INDEMNIFICATION: It is expressly understood by Seller and Buyer that [Broker and licensees] do not warrant the present or future value, size by square footage, condition, structure, or structure systems of the Property or any building . . .

Id. n.7 (emphasis in original).

Despite this disclaimer, the Court held:

Buyers of real property may rely on positive representations made by realtors and sellers about the property's size. Representations of the size of real property are statements of material fact, not expressions of opinion, and a buyer need not conduct a separate investigation to ascertain their truth.

Id. ¶ 31.

¶39 It is this paragraph on which Williams primarily relies, arguing that it overcomes the contractual disclaimer here that no representations were warrantied and that "purchaser is relying solely on its own investigations and not on any information provided or to be provided by seller." Although the conclusion of the Bowman case is clear, the Court's legal basis for its ruling in Bowman requires further inquiry.

¶40 A court generally lacks the power to revise or strike clauses from an unambiguous contract. Bowman discusses the doctrine of caveat emptor, holding that this common law doctrine does not reach situations where a purchaser of real property has relied upon a positive representation of material fact. However, an express contractual disclaimer of warranty does not rely on caveat emptor, but on a specific written agreement between the parties. Parties are largely free to 'contract around' common law and statutory requirements, unless to do so would offend the public policy embodied in the common law or a statute.[10] We can only assume, therefore, that the Court in Bowman found the disclaimer to be invalid because it was unconscionable and offended public policy.

¶41 The reason for such a rationale in Bowman is not hard to divine. Buyers of a residential home typically are not skilled in real estate transactions and are in no position to carry out a substantial verification of the exact square footage of a residential property before purchase. The imbalance of power between, on one side, a real estate professional who drafts a contract of adhesion disclaiming warranty, and, on the other side, an average residential buyer, is clear.

¶42 It is far less clear whether the freedom of sophisticated and equally-situated commercial parties to negotiate a contractual disclaimer of warranty should be restricted by the same public policy. The size inaccuracy in Bowman was on the order of 25 percent, rather than the 4-5 percent in this case, and this differential may have been a significant factor, but the Bowman decision does not appear to condition its application on the magnitude of the inaccuracy involved. Only two possible rules, therefore, may be derived from Bowman: either all contractual disclaimers of representations of the size of a property are invalid, or the holding of Bowman is generally restricted to residential real estate contracts of adhesion and unsophisticated residential buyers. We find the latter rule to be correct.

B. Fraud and Disclaimers of Warranty Generally

¶43 Although Bowman and Lopez do not compel a conclusion that the warranty disclaimer of the type presented here is invalid as a matter of law in a commercial real estate contract, this fact is not dispositive. The common law may still regard representations made by a party in one clause and simultaneously disclaimed in another clause, as a form of fraudulent inducement.

¶44 Williams cites Murray v. D & J Motor Co., Inc., 1998 OK CIV APP 69, 958 P.2d 823, for the principle that "a disclaimer of warranties is not material to a fraud action." Id. ¶ 35. Murray involved a consumer transaction in goods.[11] As we noted in our discussion of Bowman, however, consumer contracts for goods often operate on different UCC-based rules, and present different public policy questions.

¶45 Williams also cites a commercial case, Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp., 24 F.3d 1190 (10th Cir. 1994), for this principle. Thrifty dealt with an affirmative defense of fraud in the inducement against the enforcement of a franchise contract Brown had signed.[12] The 10th Circuit found that a jury question existed as to fraudulent inducement, despite a contractual disclaimer of a promise that vehicles would be timely delivered.

¶46 Neither Murray nor Thrifty ruled, as Williams appears to argue, that the involved disclaimers were invalid as a matter of law; rather, they held that a jury question may be presented in those circumstances and other facts may overcome the disclaimer. However, we will assume that these cases apply in the current situation and that a jury question thereby existed as to whether the disclaimer was effective against a fraud claim. Therefore, the trial court properly could not have relied on it as the basis for summary judgment against Williams' fraud claim.

C. Damages for Fraud

¶47 "In an action for fraud damages are rooted in the natural and probable consequences of the acts charged, not by the stand-alone fact that fraud was perpetrated." Bowman, 2009 OK 48 at ¶ 12. Even if the disclaimer is invalidated, the questions of reliance and detriment have some unusual twists in this case. Here, detection of the alleged fraud occurred before the date that payment was due, and no payment was made. This situation does appear to be covered by long-standing law in a number of jurisdictions, including Oklahoma. In Reger v. Henry, 48 Okla. 759, 150 P. 722, (1915),[13] the Court held that where a purchaser has been induced by the fraud of the owner through a third person to make a purchase, "she could pursue one of two remedies, rescind the contract, and restore, or offer to restore, the consideration, or affirm the contract and sue for damages."

¶48 In Thrower v. Brownlee, 12 S.W.2d 184, 185 (Tex. Ct. App. 1929), Thrower entered into a contract to sell Brownlee some lots in the city of Houston. Brownlee subsequently found that Thrower was unable to convey the lots. Brownlee sued for fraud. The court stated that "the undisputed facts show that, before the purchase was consummated, Brownlee had full notice that Thrower would not perform his promise" and noted that "[t]he rule is well recognized that a person induced to enter into a contract by fraud practiced upon him has a choice of remedies; that is, to rescind or to waive the right to rescind and to sue the wrongdoer for damages." Id. at 186. The same principle is noted in Harmony Homes Corp. v. Cragg, 390 A.2d 1033, 1035 (Me. 1978): "Ordinarily, a party may not affirm, or make use of, a contract to recover damages for breach thereof consistently with treating the contract as having been disaffirmed."

¶49 Bowman notes that "Buyers, while affirming their contract despite the misrepresentation, seek to recover the benefit of the bargain to which they believe they are entitled." Id. ¶ 14 (emphasis added). Various other cases collected at 13 A.L.R.2d 807 § 4[a], "Fraud on purchasers, lessees, bailees, etc--Purchases of land; exchanges," illustrate the same principle. If a buyer has made part payment before the discovery of the fraud, the buyer may repudiate and recover this part payment, or affirm and sue for the benefit of the bargain. Although the doctrine of election of remedies prior to judgment has largely been overcome in modern Oklahoma common law (see e.g., Howell v. James, 1991 OK 47, ¶ 14, 818 P.2d 444), these cases do not involve a genuine election of remedies, but condition the available damages in a fraud claim on when the fraud was discovered and what action the party subsequently took.

¶50 The record is clear that, no later than May 30, 2014, Williams knew of the size discrepancy. Therefore, the alleged fraud was discovered before performance by Williams was due. Payment was not due until August 1, 2014, and closing was extended until August 12. On August 12, Williams' counsel refused to close without OTP reducing the price by $480,000 and paying "attorney fees." Williams testified that he was not willing to close the deal for the contract price after the discrepancy was discovered.

¶51 This behavior is clearly a repudiation of the contract rather than an affirmance. See e.g., EKE Builders, Inc. v. Quail Bluff Associates, 1985 OK CIV APP 46, 714 P.2d 604. Applying Reger and similar law, Williams' fraud damages were therefore limited to any partial payment or other detriment incurred before that date. Williams was not entitled to both repudiate the contract and seek "benefit of the bargain" damages that would have accrued after that time.

D. Damages Before the Alleged Fraud Was Discovered

¶52 Although Williams was not entitled to "benefit of the bargain" damages after repudiation, the sum of case law indicates that a buyer who discovers fraud before a contract is consummated, and repudiates on that basis, may recover any partial payment or other detriment that has already accrued. Williams did pay $50,000 in "earnest money" that would be applied to the price if the contract was completed. The next question is, therefore, whether Williams could recover this amount as damages in a fraud claim.

¶53 If the $50,000 was a simple down payment, the situation would mirror that in Reger and similar cases. A down payment made before the discovery of the fraud and subsequent repudiation would be recoverable as damages. However, the $50,000 in this case was characterized as "earnest money" that "is to go 'hard' and non-refundable after May 30, 2014" (the end of the due diligence period). This complicates the situation and illustrates yet another reason why the general common law of contracts is difficult to apply in commercial real estate transactions, which have developed an independent contractual framework, custom, and practice.

¶54 The contract contained a due diligence period for Williams to verify the size of the various tracts and conduct other feasibility studies. It stated that OTP was to pay for surveying, but we find no record that this process was obstructed or delayed by OTP. Williams did not complete the contractual due diligence to verify the acreage until the last day of the due diligence period, and then waited some six weeks to raise the issue of the size discrepancy. Absent fraud, i.e., if the size discrepancy was a simple mistake, Williams would have still lost his earnest money. The loss of earnest money was therefore caused by Williams' own failure to complete due diligence, not by the misrepresentation of size.

¶55 In total, Williams' fraud case fails for a lack of demonstrated detriment, i.e., damages. His main claim was for lost profits he could have made on the development if the contract had gone through. The case law we have examined indicates that "benefit of the bargain" damages are available only if the plaintiff discovers the fraud after performance, or discovers the fraud before performance but affirms. If the plaintiff discovers the fraud before performance is due, and repudiates the contract, damages are limited to the detriment already incurred, but, as noted above, any loss of earnest money was caused by Williams' failure to complete due diligence. Therefore, we find no error in the court's summary judgment disallowing Williams' fraud claim against OTP.

E. Procedural Errors

¶56 Williams also argues the summary judgment process was marred by two procedural errors that require reversal. On November 14, 2014, OTP filed its motion for summary judgment on Williams' counterclaims as two separate documents, "statement of undisputed material facts" and a "brief in support." Williams responded in kind, concurrently filing a "response to plaintiff's statement of undisputed material facts" and a "response and brief in opposition to plaintiff's motion for summary judgment" on December 2.

¶57 In a March 6 order, the court, sua sponte, struck Williams' "response to plaintiff's statement of undisputed material facts" because "defendant has neither sought leave of court, nor do the rules allow the filing of two response briefs," and because the court would "not permit this disjointed approach to the summary judgment motion." We find this ruling inexplicable. Rule 13 for the district courts provides for a "motion" that is "accompanied by a concise written statement" of undisputed material fact. The rule then provides for the non-movant to file "a concise written statement of the material facts as to which a genuine issue exists and the reasons for denying the motion." The trial judge evidently discerned a crucial legal difference between a statement of facts accompanied by argument, and a statement of facts and argument. Even if such a dichotomy is intended by Rule 13, the sanction of striking Williams' response to the statement of undisputed facts was clearly an excessive and unwarranted use of the court's discretion.

¶58 The question is, therefore, whether this error is one that requires reversal of this case. We think not, for the following reasons: First, the fault in Williams' fraud case was a failure to show detriment, as we explained in detail above. Second, the decision was interlocutory, and Williams filed a motion to reconsider it after the first trial judge departed for a federal magistrate position. Williams' arguments against summary judgment were therefore heard a second time by another judge, who reached the same conclusion as the first judge.

¶59 Williams also argues that the court erred in refusing to grant a continuance in the summary judgment hearing pursuant to Rule 13(d). Williams sought a continuance to conduct discovery regarding the fraudulent intent of OTP and/or Bolding. Our decision above does not rely on fraudulent intent, however, but on Williams' failure to show detriment. Therefore, further discovery in this matter would not have affected the outcome. We find no procedural error that requires reversal of the trial court's summary judgment.

III. CLAIMS AGAINST BOLDING PURSUANT TO THE OKLAHOMA REAL ESTATE LICENSE CODE

¶60 Williams argues that the Oklahoma Real Estate License Code, 59 O.S. Chapter 20 (ORELC), provides an independent cause of action against Bolding, and that the court erred in granting summary judgment on this issue. Williams relies primarily on ORELC § 858-353 -- "Broker Duties and Responsibilities," which states:

A broker shall have the following duties and responsibilities to all parties in a transaction, which are mandatory and may not be abrogated or waived by a broker:

1. Treat all parties with honesty and exercise reasonable skill and care . . . .

¶61 Williams argues that this section creates a statutory tort against a real estate licensee for "failure to treat all parties with honesty and exercise reasonable skill and care," and that such is a private right of action separate and independent from the law of fraud (perhaps akin to contractual bad faith by an insurer). Williams states that this private right of action was established by Bowman. Bowman (commenting on an earlier version of the ORELC) noted that the Code requires a licensee to "treat all parties with honesty," and that the Code authorized "professional disciplinary action" for the making of, among other things, "substantial misrepresentations or false promises." Bowman also noted that "Buyers have not brought actions against Broker and Realtor for professional negligence, but rather for fraud and violations of a Code whose provisions are defined by a responsibility to avoid fraudulent conduct." (Emphasis added).

¶62 If the claim against Bolding was one of conventional fraud, we have already determined that Williams' fraud claim failed. Therefore, any fraud claim based in ORELC § 858-353 similarly fails, unless some additional heightened duty and additional cause of action exists. Bowman distinctly declined to address the question of any heightened duty created by ORELC where the allegations were based on conventional fraud.[14] In the same paragraph, Bowman further appeared to limit any application of a heightened duty to residential transactions with lay buyers. "A licensee may incur liability for failure to uphold that duty when lay persons such as Buyers rely upon their representations made as licensed professionals." Id. ¶ 27. We find no heightened duty created by ORELC in the circumstances of this case.

IV. WILLIAMS' MOTIONS FOR DIRECTED VERDICT AND JNOV ON OTP'S SLANDER OF TITLE CLAIM

¶63 Williams argues that OTP's claim of slander of title failed as a matter of law, and hence the court erred in submitting it to the jury over Williams' motion for directed verdict, and then in denying his motion for JNOV. An appellate court reviews a trial court's ruling on a motion for judgment notwithstanding the verdict by the same standard used by the trial court; the appellate court considers as true all evidence favorable to the non-moving party together with all inferences that may be reasonably drawn therefrom, and it disregards all conflicting evidence favorable to the moving party. First Nat'l Bank v. Honey Creek Entertainment Corp., 2002 OK 11, ¶ 8, 54 P.3d 100.

A. Procedural Questions

¶64 OTP first raises a procedural argument. It contends that Williams made a motion for directed verdict on OTP's slander of title claims after the presentation of OTP's case, but did not re-urge the motion after Williams presented his defense. Therefore, OTP argues, Williams could not file for JNOV because such a motion is not allowed unless a motion for directed verdict is presented "at the close of all the evidence." 12 O.S. 2011 § 698 (emphasis added). Therefore, OTP argues, the matter is beyond appellate review.

¶65 Myers v. Missouri Pac. R. Co., 2002 OK 60, ¶ 41, 52 P.3d 1014 states, however, that:

Our refusal to grant review of a denial of summary adjudication does not preclude post-trial appellate review of the contention that a party was entitled to judgment as a matter of law. Procedural mechanisms for pressing the issue after a trial commences or has concluded include a demurrer to the evidence, a motion for a directed verdict and a motion for judgment notwithstanding the verdict, the denial of any of which produces after trial a reviewable ruling.

¶66 Myers appears clear that a claim of fundamental legal error is not waived by the failure to re-urge a previously made motion for directed verdict at the close of the defendant's evidence. Here, we find that such error exists.

B. A Lis Pendens is a Privileged Publication

¶67 The elements of slander of title include: 1) publication; 2) a false statement in the publication; 3) malice in the publication; 4) special damage resulting from the publication; and 5) ownership or possession of the property that is the subject of the publication. Grasz v. Discover Bank ex rel. SA Discover Fin. Servs., Inc., 2013 OK CIV APP 113, ¶ 10, 315 P.3d 406; see also Morford v. Eberly & Meade, Inc., 1994 OK CIV APP 92, 879 P.2d 841; Borison v. Bank Leumi Tr. Co. of New York, 1998 OK CIV APP 196, ¶ 5, 972 P.2d 1188. In this case, the claimed publication was either Williams' petition or the lis pendens Williams filed.

¶68 Oklahoma law is clear that a publication cannot constitute a slander of title if it is privileged. Statements made in judicial pleadings normally are absolutely privileged. Kirschstein v. Haynes, 1990 OK 8, 788 P.2d 941. "This absolute privilege applies to slander of title actions." Pryor v. Findley, 1997 OK CIV APP 74, ¶ 3, 949 P.2d 1218, (citing 12 O.S.1991 § 1443.1, and Bennett v. McKibben, 1996 OK CIV APP 22, 915 P.2d 400 and the Restatement of the Law (Second), Torts, §§ 623A, 624, and 635.)

¶69 The cases of Scott-Kinnear, Inc. v. Eberly & Meade, Inc., 1994 OK CIV APP 91, 879 P.2d 838, Morford v. Eberly & Meade, Inc., 1994 OK CIV APP 92, 879 P.2d 841; and Bennett v. McKibben, 1996 OK CIV APP 22, 915 P.2d 400, make an extensive inquiry into this rule as it specifically concerns a lis pendens. Finding the lis pendens in that case "absolutely privileged," the Scott-Kinnear opinion stated that "the recordation of a notice of lis pendens is in effect a republication of the pleadings." Id ¶ 5. "The publication of the pleadings is unquestionably clothed with absolute privilege, and we have concluded that the republication thereof by recording a notice of lis pendens is similarly privileged." Id. Similarly, Morford held that "Notice of Pending Litigation is cloaked with the same privilege attaching to the issues in litigation." Id. ¶ 5. These cases are clear that the remedy in such a situation is as follows:

A party dissatisfied with the notice of lis pendens may ask the equity court for a discharge or release of the notice which may be granted after a hearing. White v. Wensauer, 702 P.2d 15, 18 (Okl.1985). If the notice is not a fair reflection of the litigation, a party may ask for sanctions. 12 O.S.1991 § 2011. A notice of pending litigation, however, serves to protect potential buyers of the property which is the subject of the unfinished litigation.

Morford at ¶5.

¶70 The matter seems quite clear. If a lis pendens contains a "fair statement of the issues," it is privileged. Id. ¶ 6.

C. The Effect of the Marketable Record Title Act

¶71 OTP argues that the case law discussed above is either overcome by or incompatible with the provisions of the Oklahoma Marketable Record Title Act (MRTA), 16 O.S. §§ 71 through 85. The "notice" provision of the MRTA is found in § 74, and states:

(a) Any person claiming an interest in land may preserve and keep effective such interest by filing for record during the thirty-year period immediately following the effective date of the root of title of the person whose record title would otherwise be marketable, a notice in writing, duly verified by oath, setting forth the nature of the claim.

Section 79 of the MRTA goes on to state, "No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land."

¶72 OTP argues that the filing of a lis pendens is a "notice" pursuant to § 74, and can therefore constitute a slander of title pursuant to § 79. Despite the three cases noted above, all of which were decided while the MRTA was in force and clearly hold that a proper lis pendens is privileged, OTP cites Ely v. Bowman, 1996 OK CIV APP 87, 925 P.2d 567, as holding the opposite. OTP argues that Ely tacitly recognized that a lis pendens is a "notice" pursuant to the MRTA because it upheld a damages award for slander of title apparently based on the filing of a lis pendens.

¶73 We note, however, that Ely was an appeal from the denial of a motion for new trial, and there is no indication that the issue of whether a lis pendens is "notice" pursuant to the MRTA was raised in the motion for new trial.[15] Therefore, any error below was waived on appeal. The "notice" issue was not before the Ely Court, and the Court could not raise it sua sponte.[16] We further note that Ely was decided by the same panel that, four months earlier, had made a twelve-paragraph analysis of this issue in Bennett and concluded that a lis pendens is privileged. We find it highly unlikely that the same panel would overrule the substantive decision it made earlier that year in Bennett, as well as the earlier Scott-Kinnear and Morford decisions, without any reference to those cases. It is clear to us that Ely did not consider this issue. We reject OTP's contention that the result of Ely contains a holding that an otherwise proper lis pendens constitutes a "notice" that can slander title pursuant to the MRTA.

¶74 More fundamentally, a "notice" pursuant to the MRTA acts as a claim of existing title or interest in the subject property, while a lis pendens "operates to bind third parties with notice that any interest they may acquire in the property pending litigation will be subject to the outcome of the action." Wells Fargo Credit Corp. v. Selby, 2001 OK CIV APP 78, ¶ 12, 26 P.3d 774 (emphasis added). Notice pursuant to the MRTA serves a different purpose than a lis pendens, and asserts different claims.

¶75 Given the principle that a bona fide purchaser for value, without notice, takes free of a prior, unrecorded claim, the filing of a lis pendens performs a valuable public function in providing constructive notice to potential third-party buyers of pending litigation. To accept that such a filing constitutes a "notice" under the MRTA and could support a slander of title claim would potentially expose a plaintiff filing a proper lis pendens to a slander of title claim and triple damages, and would discourage parties from filing a lis pendens at all.

¶76 We reject the argument the Oklahoma Legislature intended the filing of a lis pendens to constitute "notice" pursuant to the MRTA, or to allow a slander of title claim based merely on the filing of a lis pendens. OTP notes that other states have interpreted their own versions of the MRTA differently. We find, however, no basis to disregard the entirety of Oklahoma common law on the subject because of those interpretations.

D. The Accuracy of the Lis Pendens

¶77 This finding alone does not invalidate OTP's slander of title claim, however. Morford indicates that the lis pendens is privileged if it contains a "fair statement of the issues." 1994 OK CIV APP 92at ¶ 6. If a lis pendens states claims against property that are not fairly the subject of pending litigation, it may slander title. See also Ruggles v. First Nat. Bank of Carmen, 1976 OK CIV APP 40, 558 P.2d 419 (recovery of damages for slander of title is dependent upon proof of the malicious recording of an unfounded claim against the property).

¶78 OTP argues that the lis pendens was not an accurate record or re-publication of the pleadings because it included a 2.19 acre "outlot" that was not mentioned in the original contract. (See footnote 2, supra). This is certainly a bridge too far. First, we find no evidence that OTP had any desire or made any attempt to sell the "outlot" separately, or that OTP suffered any damage by its inclusion in the lis pendens. OTP obviously based its damage claim on the lis pendens hampering the transfer of the same 99.71/93.24 acres it had tried to sell to Williams, not an inability to sell the "outlot."

¶79 Second, OTP made no request for a modification of the lis pendens to remove the "outlot," a request the court easily could have granted if the 2.19 acres was not truly involved in the litigation, and hence OTP failed to mitigate its damages. Third, at various times in the litigation, OTP has argued that the shortfall was not 6.47 acres but 4.28 acres. The shortfall is reduced to 4.28 acres by subtracting the 2.19 acre "outlot" from the property Williams would receive under the agreement. (See footnote 2, supra). OTP is thereby estopped by this behavior from claiming on appeal that the "outlot" was never legitimately at issue in the litigation.[17]

 

E. Malice

 

¶80 OTP also appears to argue that, provided it can show that Williams acted with "malice" or "bad faith" in filing and maintaining his suit, it can seek damages for slander of title. The trial judge appeared to agree with this theory. (Trial Tr. Vol III, pp. 556-57). However, malice alone is not a basis for a slander suit. A true statement may be publicized with the most malicious intent, but it will not constitute slander because truth is an absolute defense in that context. Likewise, a pleading is privileged, at least to the extent that it is not entirely unfounded, even if the plaintiff may bear ill will, hatred, or malice toward its target. Simple malice against an opponent does not render an otherwise viable claim or suit illegitimate or slanderous. Ruggles is clear that it is the malicious recording of an unfounded claim that gives rise to slander of title, not mere malice. 1976 OK CIV APP 40at ¶ 13.[18]

 

¶81 Although, after extended analysis, we have found Williams' legal theories wanting, his claims and theories were not unfounded, illegitimate, abusive, or frivolous. In total, we find that the filing of the petition and lis pendens in this case was not unfounded, and, therefore, was privileged under Oklahoma law. We find no indication that the Legislature intended to alter this situation or subject the filer of a legally justified and accurate lis pendens to damages pursuant to the MRTA. Williams' motivation in such a situation is irrelevant. As such, the district court erred in submitting OTP's slander of title claim to the jury.

 

V. THE DISTRICT COURT'S ENTRY OF JUDGMENT PURSUANT TO
16 O.S. 2011 § 79

¶82 The district court tripled the jury award for slander of title pursuant to 16 O.S.2011 § 79. Williams argues that this was in error.

A. Triple damages

¶83 Section 79 states:

A. No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land and, in any action brought for the purpose of quieting title to land, if the court shall find that any person has filed a claim for that reason, he shall award the plaintiff all the costs of such action, including such attorney fees as the court may allow to the plaintiff, and, in addition, shall decree that the defendant asserting such claim shall pay to plaintiff three times the damages that plaintiff may have sustained as the result of such notice of claim having been so filed for record. (Emphasis added).

¶84 We find it entirely clear that § 79 does not grant "three times the damages" simply because a party prevails in a quiet title action. The filing of a notice for the purposes of slandering title is a prerequisite to triple damages. We have previously determined that no prima facie case was presented for slander of title, because the petition and lis pendens were privileged in this case. Hence, neither damages for slander of title nor triple damages for the same were available. We therefore reverse the award of damages for slander of title.

VI. OTP'S AMENDED AND CORRECTED MOTION FOR AWARD OF
ATTORNEY FEES AND COSTS PURSUANT TO 16 O.S. § 79.

¶85 Section 79 is clear that "if the court shall find that any person has filed a claim for that reason, [i.e., slandering title] he shall award the plaintiff all the costs of such action, including such attorney fees as the court may allow to the plaintiff." As there was no basis to submit a slander of title claim to the jury, there is no basis for a fee pursuant to §79. Fees are available in a quiet title action if the notice and curative instrument procedure of the Nonjudicial Marketable Title Procedures Act, 12 O.S. §§ 1141.1-1141.5, is followed. We find no record of such a procedure, however. The fee award is reversed.

ANALYSIS- OTP'S ALLEGATIONS OF ERROR

¶86 OTP also alleges error by the district court, arguing 1) summary judgment against OTP's claim of fraudulent inducement by Williams was inappropriate, and 2) the district court should have directed a verdict against Williams on OTP's breach of warranty claim.

I. FRAUD/FRADULENT INDUCEMENT

¶87 OTP's fraudulent inducement claim has a somewhat novel basis. Like other fraud-based actions, a claim for fraudulent inducement must allege all the elements of common law fraud. These are: (1) a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage. Key Fin., Inc. v. Koon, 2016 OK CIV APP 27, ¶ 13, 371 P.3d 1133, citing Bowman v. Presley, 2009 OK 48, ¶ 13, 212 P.3d 1210.

¶88 OTP proposes that a jury question of fraud or fraudulent inducement must result from Williams signing the disclaimer because: 1) if Williams signed the disclaimer in good faith, he committed fraud by later claiming to rely on the acreage stated in the contract; and 2) if Williams always intended to rely on the statement of acreage, he committed fraud when he signed the disclaimer. OTP proposes that "to claim otherwise is absurd" (OTP Brief-in-Chief at p. 37). Even at the risk of absurdity, however, we disagree that the dichotomy OTP presents controls the outcome here. OTP proposes that, if a contract includes a disclaimer of warranty, a subsequent claim alleging a deficiency in the goods or property the seller provides will establish a counterclaim for "fraudulent inducement" on the part of the buyer. We do not agree that the common law generally acts in this manner.[19]

 

¶89 "The mere fact that fraud is claimed will not justify the submission of that issue unless facts are produced from which an irresistible deduction of fraud reasonably arises." Silk v. Phillips Petroleum Co., 1988 OK 93, ¶ 13, 760 P.2d 174. The two scenarios raised by OTP do not lead to an irresistible deduction of fraud. Williams may have interpreted the disclaimer as not covering the representations made in the contract; or believed it was effective at the time but later realized that the common law might invalidate it; or, as OTP alleges, he may have signed it with the intent of refusing to comply with its terms.

 

¶90 The evidence in a fraud case is usually circumstantial. Fraud may not be presumed by the jury from circumstances, but may be proved by circumstantial evidence. Silk at ¶ 13. Downs v. Longfellow Corp., 1960 OK 10, ¶ 25, 351 P.2d 999, notes that "circumstantial evidence is not sufficient to establish a conclusion where . . . the circumstances give equal support to inconsistent conclusions, or are equally consistent with contradictory hypotheses." Therefore, OTP may not rely on Williams' actions in later refusing to consummate the contract as evidence of fraud. His actions are equally consistent with each of these contradictory hypotheses.

¶91 To avoid summary judgment, OTP was required to bring some evidence that could lead to a reasonable deduction by a juror that Williams intended to breach the disclaimer at the time he signed it, and that he did so with the specific intent that OTP would rely on this disclaimer to its detriment. We find no evidence sufficient to meet this burden, and thus affirm the trial court's decision.

II. BREACH OF WARRANTY

¶92 OTP's second claim has the same root. OTP's argument is that Williams' signing of the addendum containing the disclaimer was a warranty to OTP that he would abide by the disclaimer,[20] and Williams breached this buyer's "warranty" by filing suit alleging a deficiency in the acreage. The trial court expressed some skepticism toward the theory that a buyer creates an express warranty by signing a seller's disclaimer, and we agree.[21]

 

¶93 In Scovil v. Chilcoat, 1967 OK 20, ¶ 19, 424 P.2d 87, the Court, citing International Harvester Co. v. Lawyer, 1916 OK 142, 155 P. 617, defined a warranty as follows:

 

After a careful examination of the above-cited authorities, we conclude that warranty is a matter of intention. A decisive test is whether the vendor assumes to assert a fact of which the buyer is ignorant, or merely states an opinion, or his judgment, upon a matter of which the vendor has no special knowledge, and on which the buyer may also be expected to have an opinion and to exercise his judgment. In the former case there is a warranty; in the latter case there is not[.]

¶94 This statement encompasses the traditional view of an express warranty -- an assertion of fact by a seller of which the buyer is ignorant. Maupin v. Nutrena Mills, Inc., 1963 OK 183, ¶ 10, 385 P.2d 504, repeats that "a warranty is a statement or representation made by the seller of goods." Although it appears possible for a buyer to make a warranty to a seller under limited circumstances, we find no case law indicating that signing a disclaimer of warranty inserted in a contract by a seller creates a warranty by the buyer. We find no error in the court's directed verdict.

III. APPELLATE FEES

¶95 In section V of its brief, OTP requests appellate fees. Since 2013, a motion for an appeal-related attorney's fee must be made by a separately filed and labeled motion in the appellate court prior to issuance of mandate. The motion must state the statutory and decisional authority allowing the fee. See Supreme Court Rule 1.14. If either party wishes to apply for appellate fees, they must comply with this procedure.

CONCLUSION

¶96 We reach the conclusions noted and numbered at the beginning of this opinion. The decisions of the court are affirmed in part and reversed in part consistent with these conclusions.

¶97 AFFIRMED IN PART AND REVERSED IN PART.

WISEMAN, P.J., and FISCHER, J., concur.

FOOTNOTES

[1] The purpose of the printout from the assessor's records is unclear. It appears to total more than 116 acres of described property or possibly 88 acres, depending on interpretation.

[2] Recalculating the numbers given by Williams in his demand letter, he alleges differences of -4.43, -1.95, -.72 and +.63 = 6.47 acres while OTC's counsel calculates the shortfall as 4.28 acres. There is a lack of correlation throughout the record as to the exact amount of property missing, with the shortage being described at various parts of the record as 7.1, or 6.6, or 4 percent. This confusion largely revolves around whether a 2.19 acre "outlot" that was not specifically identified in the contract but was included in the sale, should be considered. The "outlot" becomes significant later in this opinion.

[3] This argument occurred because the court struck Williams' response to OTP's statement of undisputed facts, and concerned whether the journal entry could accurately state that that the court had reviewed the facts and pleadings under those circumstances. See Section II. E., infra.

[4] In August 2015, for reasons not relevant here, a new judge was assigned to this case.

[5] Williams' briefing claims that Bowman v. Presley, 2009 OK 48, 212 P.3d 1210, and Lopez v. Rollins, 2013 OK CIV APP 43, 303 P.3d 91, invoke this remedy. They do not. Both cases involve "benefit of the bargain" damages when discrepancies were discovered after a contract was consummated rather than specific performance of an unconsummated contract.

[6] Hayhurst's Estate is a rather odd decision because the 160 acres was not actually lost due to the "hazards of establishing a marketable title" but by Fannie's decision to take a statutory share.

[7] Given that this doctrine is purely equitable, it further raises the possibility that, if the acreage is found to be larger than believed, the seller could demand the courts set a higher purchase price than that agreed to. This re-writing of contracts is clearly an area the district courts should avoid, if possible.

[8] See Appellants' Brief in Chief in companion Appeal No. 115,427, p. 3.

[9] The other option is described by Harkrider as "fraud in esse contractus" or fraud in the factum which goes to fraud in the execution itself rather than the contract's details. Harkrider notes, "A classic example of fraud in esse contractus is that of a celebrity who, while signing autographs, unknowingly signs a promissory note slipped in among the papers." Id. n. 20.

[10] Compare Nat'l Am. Ins. Co. v. Gerlicher Co., LLC, 2011 OK CIV APP 94, ¶ 21, 260 P.3d 1279 (parties to an insurance contract may contract out of the efficient proximate cause doctrine) with Ross v. City of Owasso, 2017 OK CIV APP 4, ¶ 8, 389 P.3d 396 (allowing public bodies to contract to keep public records secret would offend the policy embodied in the Oklahoma Open Records Act).

[11] A vehicle that was in known poor mechanical condition was contractually sold "as is" but the seller made verbal assurances that the engine had been replaced, the vehicle would provide reliable transportation, had been inspected by a mechanic, and "there's nothing wrong with it." Murray found that a jury question as to fraud/breach existed, despite the "as is" disclaimer. Id. ¶¶ 5-10.

[12] In that case, Thrifty promised Brown Flight Rental a supply of Chrysler vehicles for its rental business if Brown became a Thrifty licensee. Thrifty did not reveal that Chrysler's history of delivery delays and order cancellations during 1990 had had a "devastating impact on Thrifty licensees." Id. at 1196. This same problem continued into 1991, and Brown was unable to obtain many vehicles it had ordered. Brown defaulted on its franchise lease payments, and Thrifty sued. Brown raised a fraud defense to the franchise agreement. The agreement contained a disclaimer that "THRIFTY shall not be responsible to LESSEE . . . for any loss of business or other damage caused by an interruption of the supply of goods [vehicles] or services to be furnished hereunder by THRIFTY . . . ." Id. at 1194.

[13] Although cited by the Oklahoma Supreme Court at least eleven times, this case does not appear in OSCN, but is found in the Pacific Reporter and is available on Westlaw.

[14] "Because Buyers' arguments are anchored in an action for fraud, we do not today reach the question of whether a real estate licensee bears a heightened duty independently to ascertain the size of a [residential] property represented to potential purchasers[.]" Bowman, ¶ 27.

[15] "Bowman moved for a new trial on the ground that the 'Big House' transaction was a bona fide debt as conclusively proven by the writing; that awarding $2,500.00 as attorney fees was error because Ely failed to prove damages in her slander of title action; and finally because the court abused its discretion by taking the case under advisement for 21 months." Id. ¶ 4.

[16] It is well settled that appellate courts are not free to raise issues sua sponte and address claims or defenses that the parties did not present in the court below. Jordan v. Jordan, 2006 OK 88, 151 P.3d 117. The exception concerns questions going to appellate jurisdiction. Spencer v. Wyrick, 2017 OK 19, ¶ 1, 392 P.3d 290.

[17] The estoppel doctrine's purpose is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." Bank of the Wichitas v. Ledford, 2006 OK 73, ¶ 23, 151 P.3d 103.

[18] "Recovery of damages for slander of title, in such a case, will be dependent upon proof of the malicious recording of an unfounded claim against the property." Ruggles at ¶ 13 (citing Misco Leasing, Inc. v. Keller, 10th Cir., 490 F.2d 545; McKown v. Haught, 130 Okl. 253, 267 P. 245.).

[19] OTP's argument implies that, for example, had the Bowman Court not invalidated the disclaimer of size, the realtor in Bowman would have a prima facie fraudulent inducement claim against the buyer, despite the fact that it was the realtor's materials that inflated the size of the property by 25 percent, and the buyer had performed. The argument presented would be identical to that which OTP presents here - "the buyer signed a disclaimer of size, but then reneged on his promise and relied on our materials."

[20] That is, that Williams made what could be described as a "warranty of no warranty."

[21] Returning again to Bowman, it is evident, pursuant to OTP's theories, that the unfortunate buyer who received 25 percent less property than advertised would not only be subject to a counterclaim of fraudulent inducement, but also a counterclaim of breach of warranty, but for the lucky fact that the court invalidated the disclaimer.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1994 OK CIV APP 91, 879 P.2d 838, 65 OBJ 2732, Scott-Kinnear, Inc. v. Eberly & Meade, Inc.
Discussed
 1994 OK CIV APP 92, 879 P.2d 841, 65 OBJ 2734, Morford v. Eberly & Meade, Inc.
Discussed at Length
 2001 OK CIV APP 78, 26 P.3d 774, 72 OBJ 2175, WELLS FARGO CREDIT CORP. v. SELBY
Discussed
 2004 OK CIV APP 49, 91 P.3d 81, ROADS WEST, INC. v. AUSTIN
Discussed
 1996 OK CIV APP 22, 915 P.2d 400, 67 OBJ 1463, Bennett v. McKibben
Discussed at Length
 2011 OK CIV APP 94, 260 P.3d 1279, NATIONAL AMERICAN INSURANCE CO. v. GERLICHER COMPANY, LLC
Discussed
 1996 OK CIV APP 87, 925 P.2d 567, 67 OBJ 3323, Ely v. Bowman,
Discussed
 2013 OK CIV APP 43, 303 P.3d 911, LOPEZ v. ROLLINS
Discussed at Length
 2013 OK CIV APP 113, 315 P.3d 406, GRASZ v. DISCOVER BANK
Discussed
 1976 OK CIV APP 40, 558 P.2d 419, RUGGLES v. FIRST NATIONAL BANK OF CARMEN
Discussed at Length
 2016 OK CIV APP 27, 371 P.3d 1133, THE KEY FINANCE, INC. v. KOON
Discussed
 2017 OK CIV APP 4, 389 P.3d 396, ROSS v. CITY OF OWASSO
Discussed
 1997 OK CIV APP 74, 949 P.2d 1218, 68 OBJ 3913, Pryor v. Findley
Discussed
 1998 OK CIV APP 69, 958 P.2d 823, 69 OBJ 2266, Murray v. D&J Motor Company, Inc.
Discussed
 1998 OK CIV APP 196, 972 P.2d 1188, 70 OBJ 253, Borison v. Bank Leumi Trust Company of New York
Discussed
 1985 OK CIV APP 46, 714 P.2d 604, 57 OBJ 83, EKE Builders, Inc. v. Quail Bluff Associates
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 2000 OK 94, 24 P.3d 821, 71 OBJ 3219, HARKRIDER v. POSEY
Discussed
 1988 OK 93, 760 P.2d 174, 59 OBJ 1688, Silk v. Phillips Petroleum Co.
Discussed
 1990 OK 8, 788 P.2d 941, 61 OBJ 241, Kirschstein v. Haynes
Discussed
 1991 OK 47, 818 P.2d 444, 62 OBJ 1507, Howell v. James
Discussed
 1997 OK 46, 936 P.2d 943, 68 OBJ 1275, Oxley v. General Atlantic Resources, Inc.
Discussed
 1916 OK 142, 155 P. 617, 56 Okla. 207, INTERNATIONAL HARVESTER CO. v. LAWYER
Discussed
 1932 OK 255, 9 P.2d 944, 156 Okla. 172, HALES v. RASMUSSEN
Discussed
 1959 OK 206, 345 P.2d 901, TICKEL v. FELTON
Discussed
 1960 OK 10, 348 P.2d 1078, LAWRENCE v. SCHELLSTEDE
Cited
 1960 OK 107, 351 P.2d 999, DOWNS v. LONGFELLOW CORPORATION
Cited
 1963 OK 183, 385 P.2d 504, MAUPIN v. NUTRENA MILLS, INC.
Discussed
 2002 OK 11, 54 P.3d 100, 73 OBJ 560, FIRST NATIONAL BANK IN DURANT v. HONEY CREEK ENTERTAINMENT CORP.
Discussed
 1967 OK 20, 424 P.2d 87, SCOVIL v. CHILCOAT
Discussed
 1967 OK 103, 428 P.2d 316, ATKINSON v. BARR
Discussed
 2002 OK 60, 52 P.3d 1014, MYERS v. MISSOURI PACIFIC RAILROAD CO.
Discussed
 1934 OK 684, 44 P.2d 5, 169 Okla. 551, NIAGARA FIRE INS. CO. v. AEBISCHER
Discussed
 1923 OK 537, 217 P. 878, 91 Okla. 298, HICKMAN v. HIGHT
Discussed
 1970 OK 224, 478 P.2d 343, IN RE ESTATE OF HAYHURST
Discussed at Length
 2006 OK 73, 151 P.3d 103, BANK OF THE WICHITAS v. LEDFORD
Discussed
 2006 OK 88, 151 P.3d 117, JORDAN v. JORDAN
Discussed
 2009 OK 48, 212 P.3d 1210, BOWMAN v. PRESLEY
Discussed at Length
 2017 OK 19, 392 P.3d 290, SPENCER v. WYRICK
Discussed
 2017 OK 82, 408 P.3d 183, BOYLE v. ASAP ENERGY, INC.
Cited
 2018 OK 40, 419 P.3d 231, PINA v. AMERICAN PIPING INSPECTION
Discussed
 2018 OK 59, 427 P.3d 1052, HALL v. GALMOR
Discussed
 1928 OK 297, 267 P. 245, 130 Okla. 253, McKOWN v. HAUGHT
Discussed
 1915 OK 1119, 150 P. 722, 48 Okl. 759, REGER v. HENRY
Discussed
 1985 OK 26, 702 P.2d 15, 56 OBJ 858, White v. Wensauer
Cited
 1985 OK 38, 706 P.2d 523, Mercury Inv. Co. v. F.W. Woolworth Co.
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 1141.1, Short Title
Cited
 12 O.S. 2011, Signing of Pleadings
Cited
 12 O.S. 698, Judgment Notwithstanding Verdict - New Trial in Lieu of Judgment
Cited
 12 O.S. 1443.1, Privileged Communication Defined - Exemption from Libel
Cited
Title 16. Conveyances
 Cite
Name
Level

 16 O.S. 71, Marketable Record Title Defined
Cited
 16 O.S. 79, Slanderous Notices of Claims - Penalties for Filing
Discussed at Length
Title 59. Professions and Occupations
 Cite
Name
Level

 59 O.S. 858-101, Short Title
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA